798 A.2d 1219

**Earl G. WALKER**

v.

**STATE of Maryland.**

**No. 0658 Sept. Term, 2001.**

Court of Special Appeals of Maryland.

May 31, 2002.

506

508

David A. Martella (Barry H. Helfand, on the brief) Rockville, for appellant.

Rachel Marblestone Kamins, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Douglas Gansler, State's Attorney for Montgomery County, Rockville, on the brief) for appellee.

Argued before SALMON, SONNER, ADKINS, JJ.

ADKINS, J.

Among other issues, we are asked to decide in this case whether the State may impeach its own witness with a prior inconsistent statement under Md. Rule 5–607 when the State was not surprised by the witness's testimony. A jury in the Circuit Court for Montgomery County convicted Earl Walker, appellant, of one count each of distribution of cocaine and conspiracy to distribute cocaine arising from a May 4, 2000 transaction. The jury acquitted appellant of identical charges stemming from a May 3, 2000 transaction. Appellant presents four questions for our review.

I. Did the trial court err by allowing the State to impeach its own witness with a prior unsworn statement when the State was not surprised by that witness's testimony?

II. Did the trial court err in denying appellant's request for a mistrial?

III. Did the trial court err in denying appellant's motion *in limine* to exclude all hearsay statements made by a non-defendant during a drug transaction about having to contact "his guy"?

IV. Was the evidence sufficient to convict appellant of the charges stemming from the May 4 transaction?

As to the first issue, we shall hold that the State need not prove surprise in order to impeach its own witness. As to issues II, III, and IV, we find no error by the trial court. Appellant's convictions are affirmed.

## FACTS AND LEGAL PROCEEDINGS

In early May 2000, the Montgomery County Police Department arranged a series of undercover drug buys from Gerald Myrick, the target of an investigation. Officer Charles Carafano, a detective assigned to the Special Investigation Division, Street Level Drug Enforcement Unit, arranged the buys.

On May 3, Officer Carafano called Myrick at the pizza restaurant in Derwood, Maryland where Myrick was employed at the time. Carafano asked to buy $100 worth of crack

cocaine. Myrick told Carafano that "he had to call ... 'his guy' and ... would call [Carafano] right back." Carafano testified that, a few minutes later, Myrick called him back and told Carafano to report to the restaurant "a little bit before 7:00 [p.m.]" and that "his guy was going to be there at 7:00 p.m."

When Carafano arrived at the restaurant, Myrick approached him, took his $100,[1] and retreated into the restaurant. Several minutes later, a silver Honda with temporary registration tags pulled out from the rear of the restaurant. At trial, Carafano identified appellant as the driver of the Honda. Several minutes after the Honda departed, Myrick came out from the same area behind the restaurant, and handed Carafano three rocks of suspected crack cocaine, wrapped in cellophane. Carafano then left the premises.

Officer Heath Marshall followed the silver Honda when it left the restaurant on May 3. He recorded the car's temporary registration tag number, and noted that the vehicle had only one occupant.

On May 4, Carafano again called Myrick at the restaurant, and arranged to buy another $50 worth of crack cocaine. Again Myrick said he would "call his guy," and he later called Carafano back to finalize the deal. This time, Myrick told Carafano to meet him at Myrick's house after he got off from work. Myrick was standing on a stoop outside his home talking on the phone when Carafano arrived. When Myrick got off the phone, he approached Carafano and asked for the $50. Myrick then walked down the street and out of Carafano's line of vision to get the cocaine, while Carafano waited outside Myrick's residence. About twenty minutes later, Myrick returned and handed Carafano three rocks of unwrapped suspected crack cocaine. At trial, the parties stipulated that the substance seized on both May 3 and May 4, and suspected to be crack cocaine was, in fact, crack cocaine.

---

1. The money used in these drug transactions consisted of pre-recorded drug enforcement funds.

Officer Dan Helton was surveilling the area around Myrick's house during the undercover operation on May 4. Helton observed Myrick meet with another man, later identified as Roland Christian. The two men waited at the street corner, and "began looking up and down the road as if they were waiting for somebody or looking for somebody." Helton then observed a silver Honda with a temporary registration tag drive up to the men. Myrick approached the driver's side of the car, while Christian approached the passenger's side. According to Helton, Myrick reached his right hand into the car through the driver's side window, while Christian reached his right hand in through the passenger's side window. The two men then retracted their hands from the car, and placed them into their right pant pockets. Helton did not observe whether the men's palms were open or closed when they exited the car's windows. The Honda then drove away. Helton identified appellant as the driver of the Honda.

Officer Marshall was also part of the May 4 surveillance unit, and also observed the interaction between Myrick and the occupants of the silver Honda on that date. According to Marshall, the temporary registration tag number of the Honda matched that of the Honda seen leaving the pizza restaurant where Myrick worked on May 3. Marshall was ordered to follow the Honda, and later to stop the car after the drug deal was verified. Marshall also identified appellant as the driver of the Honda.

While searching the car, officers recovered a wallet from the front driver's seat. This wallet contained several cards bearing appellant's name and $240, $70 of which was traced to the $100 given to Myrick during the May 3 drug buy. A strip search of the passenger yielded the $50 in pre-recorded funds that had been used in the May 4 drug buy.

At trial, Gerald Myrick was compelled to testify after being assured immunity from state and federal prosecution. The details of Myrick's testimony, and the events leading up to that testimony, will be discussed more fully below.

## DISCUSSION

### I.

### State's Impeachment Of Its Own Witness

Appellant first alleges that the trial court erred in allowing the State to impeach Gerald Myrick, its own witness, with a prior unsworn statement he made to the police. The State counters that its impeachment of Myrick was proper under the circumstances.

The background of this dispute is as follows. Myrick apparently was supposed to testify for the State under the terms of a plea agreement. Prior to appellant's trial, Myrick gave an oral statement to the police implicating appellant. At the start of appellant's trial, however, the prosecutor proffered that she had learned the preceding Friday that Myrick was no longer willing to testify. Therefore, the prosecutor moved to compel Myrick's testimony. Because Myrick's attorney was not present at the time, the court delayed ruling on the motion.

After the jury was selected, the court resumed discussion of the motion. The prosecutor called Myrick to the stand outside the presence of the jury. Myrick exercised his Fifth Amendment rights, and indicated that he would refuse to testify if called during the trial. Myrick's attorney opposed the State's motion to compel Myrick's testimony, raising concerns about the use of Myrick's in-court testimony in future state and federal prosecutions of Myrick. After both state and federal immunity from prosecution were secured, the court granted the State's motion to compel, and Myrick took the stand.

Myrick testified that on May 3, he arranged to meet Carafano at the restaurant where he worked. On direct examination the following dialogue occurred:

Q: [D]id you meet with [Officer Carafano] for the purpose of distributing to him cocaine?

A: Yes.

Q: Did you make arrangements for him to meet you at [the pizza restaurant] for that same transaction?

A. Yes.

Q. And, when you met with Officer Carafano, did he provide you with money?

A. Yes, he did.

Q. And did you go back into the [pizza] store?

A. I believe I did, or I think I walked around the store.

Q. And where were you going?

A. To go pick up the stuff that I had on the ground.

Q. Where did you pick that stuff up?

A. It was right behind [the pizza restaurant].

Q. And was there anybody behind [the pizza restaurant] when you went back there?

A. Yes.

Q. Who was behind there?

A. Earl Walker.

Q. And did he provide you with that cocaine?

A. No.

Q. What was he doing back there, do you know?

A. I had owed him some money. I had told him when I get off work, I would pay him.

Q. And did you pay him the money that you had owed him?

A. Yes, ma'am.

Thereafter, outside the presence of the jury, the prosecutor announced her intention to impeach Myrick with his prior statement to the police, which, contrary to Myrick's in-court testimony, implicated appellant. The statement had been reduced to some sort of writing,[2] which was not signed or otherwise adopted by appellant. The prosecutor acknowledged:

---

2. The writing referred to in the testimony was not offered into evidence, so we do not know what form it took.

We cannot get this statement in as substantive evidence under the *Nance* case and the new rules that came along from *Nance* which do require that any prior inconsistent statement be signed by the individual prior to it being admitted into evidence as substantive evidence.

The following exchange took place between the prosecutor and the court:

THE COURT: [D]o you represent that you are taken by surprise by [Myrick's] testimony?

[THE PROSECUTOR]: This is the first I have heard this particular version.

THE COURT: Okay. Well, the last version you had was the one that was consistent with your statement?

[THE PROSECUTOR]: When I last spoke to Mr. Myrick, he had indicated that this statement was true.

The trial judge then heard from appellant's attorney.

[DEFENSE ATTORNEY]: I think, first, we would like to know when ... the last time she spoke with Myrick was; but beyond that, ... I don't think the State should be allowed to ask a question of a witness where they have, in essence, set up this claim of surprise. I don't think they should be [deemed] surprised.

They came in here with a written motion trying to compel testimony from this guy. This is what happens on occasion when you work with somebody who was a co-defendant, who the [c]ourt has found to be a co-conspirator, and that is the risk they take.

I think, when we go through a trial and [the State] want[s] to use witnesses of this sort—that people lie, that people tell untruthful statements about somebody to gain favor with the State at the time—and they shouldn't be allowed to claim surprise now, when all along, since this morning—I think in all fairness, the State [k]new there [were] going to be problems with Myrick—so, to now claim surprise, I just think is a little poor.

After hearing from both sides, the trial court found that the State indeed, was surprised by Myrick's in-court testimony.

> THE COURT: Okay, I think the State's claim of surprise is legitimate. I will allow ... the witness to be cross-examined about the statement.... [but] you are stuck with his answers.

The State then continued its examination of Myrick:

> Q. Mr. Myrick, do you remember giving a statement to the police ... on the night of your arrest on May 4th of this year?
>
> A. Yeah, partially; yes, ma'am.
>
> Q. And do you remember in that statement indicating "I got [a] $100 rock of crack cocaine from Earl or Eric, drives a silverish colored Honda." I have the statement if you want to see it?
>
> A. Okay. I remember telling him from him bugging me, I remember of some sort. It is not really clear to me, because I was pretty much beat up at the time.
>
> Q. But—
>
> A. So I don't know exactly what I was—you know, I haven't even really seen the statement myself. So I don't know.
>
> Q. Well, that is not true. I showed you the statement on Friday, did I not? ...
>
> A. Oh, yes....
>
> Q. And did you not tell the police "I got $100 rock of crack cocaine from Earl or Eric, drives a silverish colored Honda?"
>
> A. Yeah, I did say this on this thing.

### A.

### Surprise After The Abolition Of The Voucher Rule

Appellant first asserts that the State's impeachment of Myrick with his prior statement was improper because the State was not "surprised" by his exculpatory testimony. Cit-

ing *Spence v. State,* 321 Md. 526, 530, 583 A.2d 715 (1991), appellant alleges that the State called Myrick merely as a "subterfuge to admit, as impeaching evidence, otherwise inadmissible hearsay." He asserts that the prosecutor's statement, referring to Myrick's in-court testimony, that "[t]his is the first time I have heard this particular version," demonstrated that the prosecutor "was not surprised by Myrick's recantation." [3]

The State vehemently objects to appellant's characterization of the prosecutor's comment, and argues that, although Myrick had previously refused to testify, "[w]hen the State gave [Myrick] immunity and ensured that the federal government would do the same, the landscape changed." Therefore, the prosecutor had reason to believe that, because of his newly-attained immunity from prosecution, Myrick's testimony would be consistent with the statement he gave to the police. The State asserts that appellant's reliance on *Spence* is misplaced.

The Court of Appeals has explained that the purpose of impeachment evidence is

> not to establish guilt, but to attack the credibility of a witness who has offered detrimental testimony. In other words, the best result the State can hope for when it tries to impeach a witness is to neutralize that witness's testimony in the mind of the factfinder. No matter how incriminating, evidence admitted exclusively for purposes of impeachment is not substantive evidence of guilt and will not support a conviction. Its only purpose is to negate prior testimony.

---

**3.** Appellant also asserts error in the trial court's denial of his request to have Myrick testify outside the presence of the jury, to determine whether his testimony would, in fact, be inconsistent with his previous statement. We agree with the State, however, that appellant has not preserved a challenge on this basis because, after recommending to the court that Myrick testify outside the presence of the jury, appellant acquiesced in the court's decision not to adopt that recommendation without further objection. *See* Joseph F. Murphy, Jr., *Maryland Evidence Handbook* § 107(A) (3d ed.1999). Therefore, we will not address this allegation of error. *See* Md. Rule 8–131(a)

*Stewart v. State,* 342 Md. 230, 242, 674 A.2d 944 (1996) (citations omitted).

Until 1989, the general rule was that a party could not impeach his own witness. *See Spence,* 321 Md. at 528 n. 1, 583 A.2d 715; *Wright v. State,* 89 Md.App. 604, 610, 598 A.2d 1214 (1991), *cert. denied,* 325 Md. 620, 602 A.2d 711 (1992). This rule, known as the "voucher rule," was premised on the idea that a party calling a witness "vouched" for the credibility of that witness. *See Gen. Motors Corp. v. Lahocki,* 286 Md. 714, 727, 410 A.2d 1039 (1980).

> The reason for the rule ... is traced by Wigmore back to primitive times when persons who attended trial on behalf of the parties were not witnesses in the modern sense of the term, but "oath-helpers." They were chosen literally to "swear off" the party on whose behalf they were called and were "ex-officio" partisans, which made it inconceivable that the party calling them could at the same time "gainsay" their testimony.

*Illinois v. Gonzalez,* 120 Ill.App.3d 1029, 76 Ill.Dec. 393, 458 N.E.2d 1047, 1054 (1983), *aff'd,* 104 Ill.2d 332, 84 Ill.Dec. 457, 472 N.E.2d 417 (1984). A limited exception to this rule applied when the party calling the witness could demonstrate that it was surprised by that witness's testimony. *See Poole v. State,* 290 Md. 114, 118, 428 A.2d 434 (1981); *Sanders v. State,* 1 Md.App. 630, 642, 232 A.2d 555 (1967).

The 1989 adoption of Md. Rule 1–501, now Md. Rule 5–607, eliminated the common law "voucher rule." *See Spence,* 321 Md. at 528 n. 1, 583 A.2d 715. Rule 5–607 provides that, "[t]he credibility of a witness may be attacked by any party, including the party calling the witness." Md. Rule 5–607 is derived from Federal Rule of Evidence (Fed. R. Ev.) 607, and mirrors its language. *See Bradley v. State,* 333 Md. 593, 600 n. 2, 636 A.2d 999 (1994). Two years after adopting the rule, the Court of Appeals, in *Spence,* clarified that Md. Rule 5–607 does not authorize the use of any and all prior inconsistent statements

to impeach a witness.[4] Rather, relying on federal authority, the *Spence* Court held that the rule allowing impeachment of one's own witness does not permit the State to call a witness "who it knows will contribute nothing to its case, as a **subterfuge** to admit, as impeaching evidence, otherwise inadmissible hearsay evidence." *Spence,* 321 Md. at 530, 583 A.2d 715 (emphasis added). We will return to a discussion of *Spence,* and subterfuge. We must first address, however, the question of surprise.

Here, the trial court expressly found that the State was surprised by Myrick's testimony. Based on our review of the record, we doubt that the prosecutor truly was surprised in the classic sense. *Compare Sellman v. State,* 232 Md. 344, 347–49, 192 A.2d 788 (1963)(surprise shown) *and Jenkins v. State,* 14 Md.App. 1, 2–3, 285 A.2d 667 (1971)(finding of surprise held proper) *with Gray v. State,* 219 Md. 557, 558, 150 A.2d 221 (1959)(no surprise where witness fully repudiated statement in prosecutor's office prior to trial). In saying that it was "the first I have heard this particular version," the prosecutor evaded the court's question about surprise, and gave a carefully qualified answer. She did not clarify that answer much when she said, "When I last spoke to Mr. Myrick, he had indicated that this statement was true." It is not clear whether she last spoke to him before he exercised his Fifth Amendment rights, indicating he did not want to testify, or after. We will not decide the validity of the court's determination that the prosecutor was surprised, however, because we hold that surprise is no longer a prerequisite to a party's impeachment of its own witness under Md. Rule 5–607.

The subterfuge limitation is the only limit to a party's impeachment of its own witness under the rule. We shall hold

---

4. On July 1, 1994, when Maryland Rule 1–501 became Rule 5–607, the Committee Note was revised to reflect the holding in *Spence.* The following sentence was added: "[The Rule] does not permit a party to call a witness solely as a subterfuge to place and otherwise substantively inadmissible statement before the jury." *Compare* Md. Rule 1–501 (1994) *with* Md. Rule 5–607 (1995); *see Bradley v. State,* 333 Md. 593, 600 n. 2, 636 A.2d 999 (1994).

that the record supports the conclusion that the subterfuge limitation was not violated, because the prosecutor did not call Myrick primarily as a subterfuge to get before the jury inadmissible hearsay evidence. We explain this holding below, starting with the history of the surprise requirement as it related to the voucher rule.

The surprise requirement under the common law "voucher rule" was developed to ease a rule that had harsh applications in certain circumstances. Although the "voucher rule" was premised on the idea that, when a party called a witness, he vouched for the credibility of that witness, it was thought unjust to preclude a party surprised by a turncoat witness from demonstrating why he called that witness. As explained by the Court of Appeals:

> If the witness has made to the party who calls him, or to the attorney of such party, a statement totally variant from his sworn testimony, and on the faith of such statement he has been called, he may be asked if he made such a statement, and if he denies it, we see no objection to the proof of such statement, not for the purpose of impeaching the general character of the witness, but for the protection of the party calling him. If a plaintiff calls a witness, relying upon statements made to him or his attorney, and when on the stand he proves the defendant's case, we think that the principles of justice require that the plaintiff should be able to show why he called him.

*Smith v. Briscoe*, 65 Md. 561, 569, 5 A. 334 (1886)(emphasis omitted).

Since the elimination of the voucher rule by the adoption of Md. Rule 5–607, the Court of Appeals has only discussed the requirement of surprise on one occasion. In *Bradley*, the Court extended its ruling in *Spence*, and held that the State may not, when questioning its own witness, enter a clearly "independent area of inquiry ... for the sole purpose of impeaching the witness in the clearly separate area." *Bradley*, 333 Md. at 605, 636 A.2d 999. The Court announced what it characterized as a "limited" holding:

[A] defendant is denied a fair trial if the State, with **full knowledge** that its questions will contribute nothing to its case, questions a witness concerning an independent area of inquiry in order to open the door for impeachment and introduce a prior inconsistent statement.

*Id.* at 604, 636 A.2d 999 (emphasis added).

After announcing that holding, the Court went on to say that "the State is still entitled to impeach a witness with a prior inconsistent statement if the witness's testimony comes as a surprise." *Id.* at 606, 636 A.2d 999. This comment, however, was made in the context of discussing the long recognized exception to the voucher rule, *i.e.,* that a party could impeach his own witness if he was surprised. The Court cited a voucher era case to explain its point:

For instance, if the State called Adrian Bradley expecting him to provide testimony favorable to the State, but Bradley unexpectedly did otherwise, impeachment would be permitted. *See Poole v. State,* 290 Md. 114, 118, 428 A.2d 434 (1981)(explaining that, even prior to the elimination of the voucher rule, impeachment of one's witness by a prior inconsistent statement would be permissible where "the calling party [was] surprised" by the witness's testimony). In this case, however, the State expressly informed the trial judge that it knew Adrian Bradley would deny any incriminating statements were made in the telephone conversation.

*Id.* at 606–07, 636 A.2d 999.

We do not read *Bradley* as intending to hold that surprise is a **prerequisite** to a party's impeachment of its own witness under Md. Rule 5-607, as it was under the voucher rule. Rather, we think the *Bradley* court intended to clarify that if, unlike *Bradley,* the prosecutor was truly surprised by his or her witness, the prosecutor necessarily could not be introducing the prior statement as a subterfuge. In other words, the subterfuge limitation that was applied in *Bradley* would not be violated if surprise were shown.

This is not the same as saying that surprise is required every time the prosecution impeaches its own witness.[5] There are cases in which the prosecutor has legitimate reasons for calling the witness, because the witness can provide useful testimony. The prosecutor may know, however, that the witness's testimony will not be fully consistent with the witness's prior statements. Thus, for example, the State might call a witness to a robbery, who would testify to a description of the robber, including height, weight, hair, and type of facial features. The State might know, however, that the witness had retreated from his original statement to the police that the area of the robbery was sufficiently well lit for him to see the robber clearly. If the witness testified on the stand that it was quite dark, and his vision was poor, the State, despite its knowledge of the witness's retreat, would have a legitimate need to introduce his prior statement to impeach his description of the lighting conditions. This would not be a subterfuge because the witness's testimony was still useful to the State, and questions about the lighting conditions did not amount to an independent area of inquiry. *See, e.g., United States v. DeLillo,* 620 F.2d 939, 946–47 (2d Cir.1980)(prosecutor with advance knowledge of inconsistency allowed to impeach witness with prior statement when witness, in testifying that corporation had committed criminal fraud, omitted details,

---

**5.** In *Stewart v. State,* 104 Md.App. 273, 655 A.2d 1345 (1995), *aff'd,* 342 Md. 230, 674 A.2d 944 (1996), we were faced with the question of whether the subterfuge rule of *Spence* prohibited admission of a prior **written** statement, which otherwise qualified for admission as substantive evidence under *Nance v. State,* 331 Md. 549, 629 A.2d 633 (1993), and Md. Rule 5–802.1(a). Because the prior statement was substantively admissible, however, we were not called upon to decide whether surprise was a prerequisite to admission. In dicta, however, we referred to the surprise rule as being "very much alive." *See Stewart,* 104 Md.App. at 284, 655 A.2d 1345. We did not explain, however, in what context surprise was to be utilized. Nor did we examine what changes in the surprise rule were effectuated by the adoption of Rule 5–607. What we intended in *Stewart,* when we said that the surprise rule was still "very much alive," was similar to what we think the Court of Appeals intended in *Bradley*—that if a prosecutor is truly surprised by his or her witness, then there is no subterfuge. To the extent that the *Stewart* opinion suggested that surprise is a "requirement" under Rule 5–607, we decline to follow this dictum.

previously stated, that would implicate one of its principals in the crime).[6] The Court of Appeals cited *DeLillo* as an example of a case in which "[t]he State may impeach those portions of a witness's testimony that do not comport with the prosecution's theory of the case[,]" provided the area of inquiry is not clearly independent. *Bradley*, 333 Md. at 604–05, 636 A.2d 999.

*Foreman v. State*, 125 Md.App. 28, 723 A.2d 912 (1999), illustrated another circumstance in which prior statements can be used to impeach, even in the absence of surprise. In that case, the prosecutor had reason to suspect, but not full knowledge, that his witness would recant. In *Foreman*, a domestic assault prosecution, the victim and his mother had refused the prosecutor's request for an interview. At trial, the jury heard the testimony of a police officer that the mother had stated that Foreman had kicked the victim, slapped him, and pushed him into the wall. The jury also heard from an EMT, who testified that the mother had said that Foreman had punched the victim in the face and kicked him in the chest. When the victim and mother were called to the stand, they both testified that the victim sustained injuries when beaten up at school, and that the injuries were not caused by appellant. The State was then allowed to re-call the police officer to impeach the mother's testimony.

On appeal, Foreman argued that the introduction of the mother's prior statement for impeachment purposes was error under *Spence* because the prosecutor knew she would repudiate that statement if called to testify. We rejected this argument.

---

6. The Second Circuit specifically rejected DeLillo's argument that the government had to be surprised in order to impeach its own witness:

> To the extent that defendants rely on [*United States v. Morlang*, 531 F.2d 183 (4th Cir.1975)] for the principal that a witness cannot be put on the stand if the side calling him knows that he will give testimony that it will have to impeach, it seems clear to us that the effect of Fed.R.Evid. 607, codifying the right to impeach one's own witnesses without special restriction, is to nullify the plausibility of such a reading.

*United States v. DeLillo*, 620 F.2d 939, 946–47 (2d Cir.1980).

In this case, the record shows that it was at the suggestion of appellant's trial counsel that the victim and the victim's mother refused the prosecutor's request for an interview. At no time prior to trial, however, did either of these witnesses "recant" their statements to [the police officer] and EMT[.] In the absence of any recantation, the prosecutor was not foreclosed from attacking their credibility through questions directed at proving . . . that they had made statements that are inconsistent with their present testimony.

*Id.* at 33–34, 723 A.2d 912. We read *Foreman* as holding that, in the absence of full knowledge on the part of the State that its witness will recant his or her prior statement, the subterfuge limitation to Md. Rule 5–607 is inapplicable.[7]

*Pickett v. State,* 120 Md.App. 597, 707 A.2d 941 (1998), is another example of a prosecutor having partial knowledge— something more than absolute surprise but less than full knowledge of the turncoat witness's intent. There, without deciding whether surprise was necessary, we applied the Md. Rule 5–403 balancing test,[8] weighing the probative or impeachment value of the turncoat witness's prior inconsistent statement against its prejudicial effect on the defendant in deciding whether to admit the statement for impeachment purposes under Md. Rule 5–607. *See id.* at 605–07, 707 A.2d 941.

In *Pickett,* the State called the defendant's sister to the stand. On direct examination, the prosecutor hoped to elicit testimony that the defendant had admitted to his sister his involvement in the crime. The sister, however, testified "I told you that. He never made [any admissions] to me." *Id.* at

---

7. The *Foreman* court also found the prior inconsistent statement admissible as substantive evidence under the excited utterance exception to the hearsay rule. *See Foreman v. State,* 125 Md.App. 28, 34, 723 A.2d 912 (1999).

8. Md. Rule 5–403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

601, 707 A.2d 941. The defense did not cross-examine the witness. Subsequently, the State called a police detective who testified, over defendant's objection, that he had engaged in several conversations with the witness, during which she had divulged that her brother had "bragg[ed] to her" about his involvement in the crime. *See id.* at 602–03, 707 A.2d 941.

In appealing his convictions, Pickett argued that the detective's testimony "constituted impermissible impeachment evidence." *Id.* at 603, 707 A.2d 941. Recognizing that it was unclear whether the prosecutor knew that the witness's testimony would be exculpatory to the defendant prior to calling her, we looked to the Fourth Circuit case of *United States v. Ince,* 21 F.3d 576 (4th Cir.1994), for guidance. Relying heavily on the reasoning of *Ince,* we stated:

> [We do not] expect the trial judge to "crawl inside the prosecutor's head to divine his or her true motivation" in calling a witness. Nevertheless, in determining whether a witness's testimony offered as impeachment is admissible, or, on the contrary, is a "mere subterfuge" to get before the jury otherwise inadmissible hearsay, the trial court is required, as is the case with any evidence, to weigh the testimony's probative value against its tendency to prejudice the defendant unfairly or to confuse the jury. In these circumstances, the testimony's probative value is defined as its value for impeachment purposes, that is, its likelihood of actually damaging the witness's credibility.

*Id.* at 604–05 (citations and footnotes omitted).

In performing the Md. Rule 5–403 balancing test, we determined that the prejudicial value of the prior statement was great, because it served as a "detailed admission of the crimes charged" and "portray[ed] [the defendant] as a ruthless and remorseless thug." *Id.* at 605. As to the statement's probative or impeachment value, we concluded that the statement had little probative value because the State did not need to attack the witness's credibility because her testimony did not affirmatively damage the State's case, and because much of her testimony was helpful to the State. We held that the

court erred, as a matter of law, in allowing the State to impeach the witness with her alleged prior inconsistent statement inculpating the defendant. *See id.* at 607.

*Pickett's* holding that trial judges need not crawl into the prosecutor's head to divine his or her true motivation in calling a particular witness is consistent with *Spence* and *Bradley*. In those cases, there was no need to crawl inside the prosecutors' heads because their intentions were objectively clear—in *Spence* because the witness disclosed to the judge and prosecutor in a bench conference that his testimony would be exculpatory to the defendant, and in *Bradley* because the prosecutor informed the trial court prior to calling his witness that he knew that the witness would testify inconsistently with his prior statements. Thus, no judicial "guessing" as to the prosecutors' true intentions was undertaken in those cases.

*Pickett* arguably provides authority for the resolution of this case because here, as in *Pickett,* it is not clear that the prosecutor had full knowledge that the witness would recant. We think that the record in this case, however, suggests more strongly than did the record in *Pickett* that the prosecutor had knowledge. A cleaner path to resolution of this case, then, lies in resolving the question of whether surprise is even required for impeachment of one's own witness under Md. Rule 5–607, an issue on which the *Pickett* Court expressly reserved decision. *See id.* at 605 n. 1, 707 A.2d 941. Indeed, we have found no Maryland case that squarely decides it.

Md. Rule 5–607 contains language identical to Fed. R. Ev. 60*ι.* Because our rules of evidence are largely modeled after their federal counterparts, we often look to the federal courts, and their interpretation of federal rules, for guidance in interpreting our own rules. *See Garay v. Overholtzer,* 332 Md. 339, 355, 631 A.2d 429 (1993). We seek such guidance on this issue.

In the federal system, the common law voucher rule was replaced by Fed. R. Ev. 607 in 1975. The change was predicated on the modern reality that "[a] party does not hold out his witnesses as worthy of belief, since he rarely has a free

choice in selecting them." *Advisory Committee Notes to Fed. R. Ev. 607.* As we indicated earlier, under the voucher rule parties could impeach their own witnesses only if they could demonstrate surprise. In the post-voucher rule era, courts that have considered the question, including at least six federal circuits, have held that, under Fed. R. Ev. 607, it is no longer necessary for parties to show surprise in order to impeach their own witnesses. *See Robinson v. Watts Detective Agency, Inc.,* 685 F.2d 729, 740 (1st Cir.1982), *cert. denied,* 459 U.S. 1105, 103 S.Ct. 728, 74 L.Ed.2d 953 (1983); *United States v. DeLillo,* 620 F.2d 939, 946–47 (2d Cir.), *cert. denied,* 449 U.S. 835, 101 S.Ct. 107 (1980); *United States v. Palacios,* 556 F.2d 1359, 1363 (5th Cir.1977); *United States v. Webster,* 734 F.2d 1191, 1193 (7th Cir.1984); *United States v. Dennis,* 625 F.2d 782, 795 n. 6 (8th Cir.1980); *United States v. Long Soldier,* 562 F.2d 601, 605 n. 3 (8th Cir.1977); *Scholz Homes, Inc. v. Wallace,* 590 F.2d 860, 863 (10th Cir.1979). According to those courts, "Rule 607 abolishe[d] the voucher rule and its corollaries, such as having to ... show that [your witness's] testimony surprised you." *United States v. Ienco,* 92 F.3d 564, 568 (7th Cir.1996). *See also United States v. Kane,* 944 F.2d 1406, 1412 (7th Cir.1991)("The test is whether the prosecution exhibited bad faith by calling a witness sure to be unhelpful to its case").

State courts interpreting state rules that, like Md. Rule 5–607, are verbatim adoptions of Fed. R. Ev. 607 have also refused to engraft a requirement of surprise, following the lead of the federal courts. *See Burgin v. Alabama,* 747 So.2d 916, 919 (Ala.Crim.App.1999); *Eubanks v. Alaska,* 516 P.2d 726, 728 (Alaska 1973); *Arizona v. Acree,* 121 Ariz. 94, 588 P.2d 836, 838 (1978); *Connecticut v. Graham,* 200 Conn. 9, 509 A.2d 493, 498 (1986); *Morton v. Florida,* 689 So.2d 259, 262 (Fla.1997), *overruled on other grounds, Rodriguez v. State,* 753 So.2d 29 (Fla.2000); *Illinois v. Gonzalez,* 120 Ill.App.3d 1029, 76 Ill.Dec. 393, 458 N.E.2d 1047, 1055 (1983), *aff'd,* 104 Ill.2d 332, 84 Ill.Dec. 457, 472 N.E.2d 417 (1984); *Kansas v. Farley,* 225 Kan. 127, 587 P.2d 337, 341 (1978); *Thurman v. Kentucky,* 975 S.W.2d 888, 893 (Ky.1998), *cert. denied,* 526

U.S. 1009, 119 S.Ct. 1150, 143 L.Ed.2d 217 (1999); *Louisiana v. Cousin,* 710 So.2d 1065, 1070 (La.1998); *Maine v. Dodge,* 397 A.2d 588, 592 n. 6 (Me.1979); *Smith v. Oklahoma,* 766 P.2d 1007, 1009 (Okla.Crim.App.1988); *Oregon v. Warren,* 88 Or.App. 462, 745 P.2d 822, 824 (1987), *cert. denied,* 305 Or. 45, 749 P.2d 1182 (1998); *Pennsylvania v. Kimbell,* 563 Pa. 256, 759 A.2d 1273, 1279 (2000); *West Virginia v. Collins,* 186 W.Va. 1, 409 S.E.2d 181, 188 (1990); *Washington v. Hancock,* 109 Wash.2d 760, 748 P.2d 611, 612 (1988). *But see Wilkins v. Mississippi,* 603 So.2d 309, 322 (Miss.1992)(still need to show surprise or unexpected hostility).

In *United States v. Webster,* 734 F.2d 1191 (7th Cir.1984), Judge Posner explained why following a strict surprise requirement was not ideal.

Webster urges us, on the authority of Graham, Handbook of Federal Evidence § 607.3 (1981 and Supp.1983), to go beyond the good-faith standard and hold that the government may not impeach a witness with his prior inconsistent statements unless it is surprised and harmed by the witness's testimony. But we think it would be a mistake to graft such a requirement to Rule 607, even if such a graft would be within the power of judicial interpretation of the rule. Suppose the government called an adverse witness that it thought would give evidence both helpful and harmful to it, but it also thought that the harmful aspect could be nullified by introducing the witness's prior inconsistent statement. As there would be no element of surprise, Professor Graham would forbid the introduction of the prior statements; yet we are at a loss to understand why the government should be put to the choice between the Scylla of forgoing impeachment and the Charybdis of not calling at all a witness from whom it expects to elicit genuinely helpful evidence.

*Id.* at 1193.

*McCormick On Evidence* also criticizes those courts that continue the surprise requirement after abolition of the vouch-

er rule. Instead, it advocates reliance on the "mere subterfuge" limitation.

It has been widely held that a criminal prosecutor may not employ a prior inconsistent statement to impeach a witness as a "mere subterfuge" or for the *"primary* purpose" of placing before the jury substantive evidence which is otherwise inadmissible. Application of the "mere subterfuge" or *"primary* purpose" doctrine focuses on the content of the witness's testimony as a whole. If the witness's testimony is useful to establish any fact of consequence significant in the context of the litigation, the witness may be impeached by means of a prior inconsistent statement as to any other matter testified to.

John W. Strong, *McCormick on Evidence* § 38, at 142 (5th ed.1999) (footnotes omitted).

*Weinstein's Federal Evidence* also criticizes the surprise rule as being too mechanical: "[I]nflexible insistence as under prior law, on a showing of surprise and affirmative damage before the government may impeach its witness, would mean a return to the unsatisfactory mechanical approach that helped lead to the adoption of Rule 607." 4 Joseph M. McLaughlin, *Weinstein's Federal Evidence* § 607.02[2][c] (2d ed.1997)(footnote omitted). *Weinstein* is quick to add, however, that the results under a balancing test are often similar to those under the surprise test. "In most cases, of course, the Rule 403 analysis and the surprise-damage requirement will lead to the same result. The former approach, however, provides somewhat more flexibility in an unusual case." *Id.* (footnote omitted).

We think *Weinstein's* point is well-taken. The explanation for the similar results may be that a balancing test does not remove the question of prior knowledge altogether from the equation. In those cases in which it is clear that the prosecutor has full knowledge that a witness "will **contribute nothing** to [the State's] case," calling that witness with the primary purpose of placing before the jury his or her prior inconsistent statement will be considered a subterfuge. *See Spence,* 321

Md. at 530, 583 A.2d 715 (emphasis added); *see also Bradley,* 333 Md. at 604, 636 A.2d 999 ("[A] defendant is denied a fair trial if the State, with full knowledge that its questions will contribute nothing to its case, questions a witness concerning an independent area of inquiry in order to open the door for impeachment and introduce a prior inconsistent statement"); *United States v. Morlang,* 531 F.2d 183, 190 (4th Cir. 1975)("The overwhelming weight of authority is, however, that impeachment by prior inconsistent statement may not be permitted where employed as a mere subterfuge to get before the jury evidence not otherwise admissible"); Sheila A. Skojec, Annotation, *Propriety, Under Federal Rule of Evidence 607, of Impeachment of Party's Own Witness,* 89 A.L.R. Fed. 13, § 6 (2001)(collecting cases).

■ We are persuaded by the reasoning of *McCormick,*[9] *Weinstein,* and the extra-jurisdictional cases. We therefore hold that a showing of surprise is not a prerequisite to impeachment under Md. Rule 5–607. Surprise was developed as an exception to the voucher rule. Now that we have replaced the voucher rule, the exceptions developed to soften the voucher rule are no longer necessary. Although a party's knowledge or suspicion that its witness will recant still may be relevant to the determination of whether the party is calling that witness as a "mere subterfuge," as mentioned above, surprise is not a prerequisite to a party's impeachment of its own witness under the rule.

## B.

### The Ruling In This Case

■ Instead of deciding the validity of the trial court's finding of surprise, we must examine the more general question of whether the court properly allowed the State to

---

9. We do not endorse *McCormick's* language in its entirety because the last sentence of the passage we quoted from *McCormick* states the rule more broadly than the *Bradley* decision would allow. As modified by the *Bradley* "independent area of inquiry" rule, however, we find *McCormick's* reasoning to be sound.

impeach Myrick with his alleged prior inconsistent statement. In other words, our analysis must center on whether, given its knowledge of Myrick's unwillingness to testify, the State called Myrick to the stand merely as a subterfuge to introduce his prior statement that implicated appellant, or whether the State had some other legitimate purpose in calling him as a witness.

The record does not reflect that the prosecutor called Myrick as a mere subterfuge. Rather, Myrick had useful information for the prosecution—that appellant was at the scene when the sale of the cocaine took place, and that Myrick paid money to appellant that Myrick received from the drug transaction. Although the police officers also testified that they found $70 in marked money in appellant's car, which was traceable to the $100 given Myrick during the May 3 drug buy, Myrick's testimony corroborated the testimony of the police. Such corroboration always would be useful to rebut any express or implied charge that the police planted the incriminating evidence on appellant.[10] The evidence that appellant was present at the scene of the drug transaction and received some of the proceeds from the transaction permitted an inference that appellant was a guilty participant therein.

When Myrick testified that he was just giving appellant money owed on a prior debt, however, Myrick undermined the inference that appellant was a participant in the drug transaction. Thus, there arose the need to impeach this new testimony. The prior inconsistent statement damaged his credibility with regard to the new statement, and thus was probative evidence.

■ Nor did the prosecution run afoul of *Bradley*'s "independent area of inquiry" rule when it questioned Myrick about his prior statement. *Bradley* was charged with armed rob-

---

10. One notorious allegation of evidence planting occurred during the O.J. Simpson murder trial. *See also Ovando v. City of Los Angeles,* 92 F.Supp.2d 1011 (C.D.Cal.2000)(civil rights case arising from "Rampart" scandal involving police misconduct, including evidence planting).

bery, kidnapping, and related charges arising from an episode in which he drove off in the victim's vehicle, after forcing her out of it. In order to place Bradley in the victim's car shortly after the episode, the State "proffered [the victim's] phone bill, which indicated that calls were placed from her car phone to a particular phone number within one-half hour of the theft." *Bradley,* 333 Md. at 597, 636 A.2d 999. The following then transpired:

"The State ... called Adrian Bradley, appellant's cousin. He testified, on direct examination, that his home phone number [matched the number on the bill] and that he had received one or two telephone calls from appellant at that number at a time that would have been after [the victim's] car had been stolen. *It was at this point, over appellant's objection, that the State elicited from Adrian Bradley that he denied telling a detective that appellant had said to him in these telephone conversations that he (appellant) had stolen a car....* The State called [a detective] ... who recounted ... *that the cousin told him that appellant had bragged about stealing a ... car.*"

*Id.* (quoting unreported opinion of Court of Special Appeals)(emphasis added in Court of Appeals opinion). In holding that eliciting this denial from Adrian Bradley was unacceptable, the Court of Appeals explained:

The State called Adrian Bradley to establish that he was the defendant's cousin, that his phone number corresponded with the number on the victim's car phone bill (which indicated that a call was made shortly after the car was taken), and that the defendant did indeed speak with him from the car phone. After Adrian Bradley verified all of this information on the witness stand, it was improper for the State to inquire about the contents of the telephone conversation for the sole purpose of impeaching Adrian regarding the entirely separate matter of whether or not the defendant bragged about the crime in the telephone call.

*Id.* at 601, 636 A.2d 999.

Evidence of a confession by Bradley is of an entirely different nature than evidence that Bradley made a phone call

from the stolen car to his cousin's home.[11]  When the State learned that Adrian would not testify about the confession, it could still put him on to testify about the fact of the call from the stolen car, without concern that the jury would consider his testimony incomplete.  The State's confidence in this respect emanated from the fact that the absence of the confession evidence does not detract in any way from the evidence of the call having been made, which established that he was in the stolen car right after the robbery.

In contrast, if the State in this case had not asked Myrick whether Walker provided him with the cocaine, and why appellant was there, the jury might be left wondering why the State failed to complete its questioning.  For the State to stop its questioning with the fact of the payment, and not prove the reason for it, would paint an incomplete picture that might leave doubt in the jury's mind.  The picture would be incomplete because knowing the reason for the payment is inextricably linked to the occurrence of the payment.  Although a reasonable juror would not expect Bradley's cousin to know how Bradley came to be in possession of the stolen automobile, such a juror would expect Myrick to know why he paid appellant.

In *Bradley*, the Court of Appeals carefully circumscribed its holding to prohibit only those inquiries that were "clearly independent":

> [I]f the area of inquiry is not clearly independent, then the State may impeach those portions of a witness's testimony that do not comport with the prosecution's theory of the case.  Thus, in instances where a witness's testimony is not reasonably divisible into clearly separate areas of inquiry, the State may properly impeach any portion of the witness's testimony that disfavors the government's case.

---

**11.**  Bradley's defense was that he had rented or purchased the car, and was joyriding in it on the evening in question.  *See Bradley*, 333 Md. at 598 n. 1, 636 A.2d 999. The phone call to his cousin was consistent with this defense, but the confession was not.

*Bradley,* 333 Md. at 604, 636 A.2d 999. We do not believe the State's inquiry as to the reason for payment is "clearly independent" from the inquiry as to the occurrence of the payment. We thus conclude that it was not prohibited by *Bradley.*

■ Appellant asserts that the trial court failed to weigh the impeachment value of Myrick's prior statement against its prejudicial effect on appellant because the court did not review the statement before authorizing its use to impeach Myrick. The State, on the other hand, argues that the court "knew the substance of Myrick's statement to [the] police by virtue of the earlier hearing on [appellant's] motion in limine." The court, it argues, in allowing the statement to be used to impeach Myrick, implicitly concluded that the impeachment value of the statement outweighed its prejudicial effect on appellant.

In *Pickett,* we explained how probative value was defined for purposes of this test. *See Pickett,* 120 Md.App. at 605, 707 A.2d 941. Relying on *Ince,* 21 F.3d at 580–81, we explained that the testimony's "probative value is defined as its value for impeachment purposes, that is, its likelihood of actually damaging the witness's credibility." *Id.* at 605, 707 A.2d 941. In this sense, determining the probative value prong of the balancing test is the same as determining whether the prosecution has called the witness primarily as a subterfuge—*i.e.,* whether the witness has something useful to contribute to the prosecution's case other than the introduction of his prior inconsistent statement. As we discussed earlier, Myrick's testimony was useful to the prosecution's case because it corroborated the police testimony that appellant received money from Myrick that constituted the proceeds of the May 3 drug transaction.

The prejudicial value prong of the balancing test requires a court to consider whether the evidence prejudices the defendant unfairly, or misleads or confuses the jury. *See Ince,* 21 F.3d at 580; Md. Rule 5–403. In *Pickett,* the prior statement was an alleged statement by Pickett's sister that Pickett had "bragged to [her] about robbing and stabbing someone in the

McDonald's parking lot." *Pickett,* 120 Md.App. at 605, 707 A.2d 941. We found this statement to be unfairly prejudicial to Pickett because it

> not only serve[d] as a detailed admission of the crimes charged, but also portray[ed] [Pickett] as a ruthless and remorseless thug. As the Fourth Circuit noted in *Ince,* "[i]t is hard to imagine any piece of evidence that could have . . . a greater prejudicial impact than such a supposed naked confession of guilt." *[Ince,* 21 F.3d] at 581. Furthermore, the jury was permitted to hear this bald confession from the mouth of a police detective, whom the jury is likely to find trustworthy. . . . Finally, Detective Chinn was recounting appellant's alleged confession through a third person; as such, it was "hearsay of the worst variety, incapable of being countered by direct evidence."

*Id.* (some citations omitted).[12]

Unlike the statement held to be unfairly prejudicial in *Pickett,* Myrick's prior inconsistent statement did not involve a confession by appellant. Moreover, there was nothing misleading, confusing, or unfair about the admission of Myrick's prior statement that he gave the money to appellant because appellant was participating in selling the cocaine. As we stated in *Moore v. State,* 84 Md.App. 165, 578 A.2d 304, *cert. denied,* 321 Md. 385, 582 A.2d 1256 (1990),

> "[i]f [mere] prejudice were the test, no evidence would ever be admitted. Parties . . . have a right to introduce prejudicial evidence. Probative value is outweighed by the danger of 'unfair' prejudice when the evidence produces such an emotional response that logic cannot overcome prejudice or sympathy needlessly injected into the case."

*Id.* at 172, 578 A.2d 304 (*quoting* J. Murphy, *Maryland Evidence Handbook,* § 509, at 160 (1989)).

---

12. The *Ince* Court went so far as to announce a general rule that "a trial judge should rarely, if ever, permit the Government to 'impeach' its own witness by presenting what would otherwise be admissible hearsay if that hearsay contains an alleged confession to the crime for which the defendant is being tried." *United States v. Ince,* 21 F.3d 576, 581 (4th Cir.1994).

■ The record does not reflect whether the trial court conducted a balancing test. This does not necessarily mean, however, that it did not do so. There is a strong presumption that judges properly perform their duties. *See Beales v. State*, 329 Md. 263, 273, 619 A.2d 105 (1993). A trial court "is not obliged to spell out in words every thought and step of logic" leading to its determination. *See id.* There is no requirement that the trial court perform the Md. Rule 5–403 balancing test **on the record.**

■ Even if the trial court did not conduct a balancing test, however, we will not remand simply in order for it to do so. "An appellate court will ordinarily *affirm* a trial court's judgment on any ground adequately shown by the record, even though the ground was not relied on by the trial court." *Temoney v. State*, 290 Md. 251, 261, 429 A.2d 1018 (1981) (citations omitted); *accord Robeson v. State*, 285 Md. 498, 502, 403 A.2d 1221 (1979)("where the record in a case adequately demonstrates that the decision of the trial court was correct, although on a ground not relied on by the trial court and perhaps not even raised by the parties, an appellate court will affirm"); *see also Henry v. State*, 324 Md. 204, 238–39, 596 A.2d 1024 (1991), *cert. denied*, 503 U.S. 972, 112 S.Ct. 1590, 118 L.Ed.2d 307 (1992)(when prosecution unsuccessfully attempted to refresh witness's recollection with written statement, trial court admitted statement over defense's objection, giving no specific basis for admission; appellate court held that admission was proper under the past recollection recorded exception). For the reasons given above, we believe that application of the Md. Rule 5–403 balancing test compels the conclusion that Myrick's prior inconsistent statement was not introduced as a mere subterfuge. Therefore, the trial court did not err in allowing the State to use the statement for impeachment purposes.

## II.

### Denial Of Appellant's Request For A Mistrial

Appellant next asserts error in the trial court's denial of his request for a mistrial after the prosecutor questioned Myrick

about a meeting between the prosecutor and Myrick the preceding Friday afternoon. According to appellant, "the problems surrounding the State's use of Myrick's prior statement were further compounded when the prosecutor indicated to the jury that [it] should believe Myrick's prior statement rather than his [in-court] testimony because of events that took place three days earlier in [the prosecutor's] office."

The Court of Appeals has outlined the standard governing appellate review of a decision granting or denying a motion for a mistrial:

[T]he decision of whether to grant a motion for a mistrial is within the sound discretion of the trial court. The grant of a mistrial is considered an extraordinary remedy and should be granted only "if necessary to serve the ends of justice." Our review on appeal is limited to whether the trial court abused its discretion in denying the motion for mistrial. Accordingly, a reviewing court will not reverse the trial court unless the defendant clearly was prejudiced by the trial court's abuse of discretion.

*Klauenberg v. State,* 355 Md. 528, 555, 735 A.2d 1061 (1999) (citations omitted).

During the prosecutor's questioning of Myrick, the following exchange took place:

[PROSECUTOR]: Mr. Myrick, you and I met on Friday; is that correct?

[MYRICK]: Yes, ma'am.

Q. And at that time I gave you a copy of your statement, did I not?

A. Yes, ma'am.

Q. And did I not ask you at that time whether this statement was the truth?

A. Yes, ma'am.

At this point, appellant's attorney objected, and asked to approach the bench. During the bench conference, appellant's trial attorney requested, and the court denied, a mistrial.

[DEFENSE ATTORNEY]: Your Honor, based on the question [the prosecutor] just asked, what she did and what her contact with Mr. Myrick is, I am going to ask the [c]ourt for a mistrial because it puts her as a witness in this case and I don't think she can continue on. It violates all right to confront evidence in this case as to what she said to him and what she did. So, I am going to move for a mistrial....

THE COURT: I don't think that is the test. I think the test is [that] she [is] simply stuck with his answers. That is all. I don't think is makes her a witness in the case. I will overrule your objection and deny your motion to mistrial.

Thereafter, the prosecutor was allowed to proceed with the objected-to line of questioning.

[PROSECUTOR]: Okay.... [Y]ou reviewed the statement on Friday; is that correct?

[MYRICK]: Yeah[.] ...

[PROSECUTOR]: And at that time did I not ask you whether this is a true statement?

A. Yes, you did ask me that one.

Q. And at that time did you say anything to me—...

A. No, I didn't say anything to you about it.

Q. Mr. Myrick, you did not want to testify today; is that correct? ...

A. No, I didn't want to testify today.

Q. And, in fact, you are here by subpoena ... [a]nd ... have been order[ed] to testify; is that correct?

A. Yes, ma'am....

Q. Have you been threatened in any way—

A. No....

Q. Mr. Myrick, when I met with you on Friday, didn't you tell me that you had been threatened?

A. No, I don't recall. I don't remember....

Q. Mr. Myrick, on Friday, when we met in the presence of your lawyer ... you knew I was a State's [A]ttorney, did you not?

A. Right. Yeah. I just wanted to hear what you were trying to say to me.

Q. And did you not tell me that day that you had been threatened and that is why you didn't want to testify?

[DEFENSE ATTORNEY]: Objection[,] [asked and answered].

THE COURT: Sustained. . . .

[PROSECUTOR]: I have nothing further, Your Honor.

Appellant contends that "this exchange between the prosecutor and Mr. Myrick did nothing less that allow the prosecutor to testify as her own witness—without being called as a witness or being subject to cross-examination." Appellant relies solely on the federal Ninth Circuit Court of Appeals' decision in *United States v. Edwards*, 154 F.3d 915 (9th Cir.1998), to support his assertion.

The State counters that appellant's reliance on *Edwards* is misplaced, and that here, unlike *Edwards*, the prosecutor "engaged in proper cross-examination on a point critical to explaining Myrick's in-court recantation of his statement to police in which he had incriminated Walker as the person who supplied him with the cocaine that he sold to" the undercover officer on the dates in question.

*Edwards* concerned the prosecutor's personal involvement in the discovery of a key piece of evidence. Responding to a report of domestic violence, the police, upon arriving at the home, observed Edwards in a car pulling out of the driveway. Edwards was promptly arrested on suspicion of assault. While interviewing the victim, the police learned that she had seen Edwards leaving the house with a gun and a black nylon bag. After obtaining a warrant to search the car, the police found a black nylon bag in the trunk, containing a substantial quantity of crack cocaine.

Because the victim was unwilling to testify against Edwards in his trial on drug-related charges, there was nothing to connect Edwards to the bag other than the fact it was found in

the car he was driving. On the first day of trial, the witness through whom the bag was introduced acknowledged this fact.

That night, however, the defense attorney received a call informing him that the prosecutor, in re-searching the bag in the company of two police officers, had discovered a receipt bearing Edwards' name below the cardboard bottom support of the bag. Although the defense moved to exclude this evidence, the trial court denied its motion. Edwards' motion for a mistrial was also denied. Thereafter, the prosecutor called the two officers present when the receipt was discovered.

[PROSECUTOR]: Yesterday, when the bag was being examined, that was the first time that you had an opportunity to look at it?

OFFICER: Yes.

[PROSECUTOR]: To your knowledge, it was the first time that anyone else present, including myself, had an opportunity to look at it?

OFFICER: As far as I know.

[PROSECUTOR]: *That wasn't planted there, was it?*

OFFICER: *Absolutely not.*

[PROSECUTOR]: That was found by looking underneath the bottom of the bag that kind of pulls up?

OFFICER: Yes.

*Id.* at 920.

The prosecutor then examined the second officer present during the receipt's discovery.

[PROSECUTOR]: Who examined the bag down at the U.S. Attorney's Office?

OFFICER: The bag was examined by the [Assistant] U.S. Attorney in the presence of myself and Officer Richmond.

[PROSECUTOR]: At that time, was anything found in the bag?

OFFICER: . . . . The [Assistant] U.S. Attorney, yourself, sir, pulled the board or whatever it is at the bottom up, and . . . found . . . a wound up small piece of paper. . . . You un-

wrapped the paper and saw that it was a receipt of some sort from Tacoma Municipal Court. I looked at the receipt. Myself and Officer Richmond looked at it at the same time when you found it.

*Id.*

Edwards was convicted, and on appeal argued that the trial court erred both in failing to exclude the receipt and in refusing to grant a mistrial. He contended that "the prosecutor's continued representation of the government constituted improper vouching." *Id.* at 921.

The Ninth Circuit panel agreed, and reversed Edwards' convictions:

[W]hen a prosecutor is personally involved in the discovery of a critical piece of evidence, when that fact is made evident to the jury, and when the reliability of the circumstances surrounding the discovery of the evidence is at issue, the prosecutor's participation in the trial of the defendant constitutes a form of improper vouching.

*Id.* at 923.

In asserting that the "same concerns" are present in this case as in *Edwards,* appellant argues:

The prosecutor not only was an Assistant State's Attorney, she explicitly identified herself as such during her questioning of Myrick. She also told them of her 18 years of experience. She then indirectly expressed to the jury that she had special knowledge about Myrick's concerns in testifying. As in *Edwards,* the jury certainly would have a "natural tendency . . . to believe in the honesty of lawyers in general, and government attorneys in particular[.]" . . . The prosecutor's comments were essentially an explanation for the jury as to why Myrick was now providing a different, exculpatory story.

■ There are critical differences between *Edwards* and this case, however, which lead us to a different result than the Ninth Circuit reached in *Edwards.* Although the two cases are similar in that, instead of actually taking the stand as

witnesses and recusing themselves, the prosecutors pursued a line of questioning that indicated their personal knowledge of the reliability of certain evidence, the similarity of the two cases stops there.

First, *Edwards* featured the prosecutor's direct involvement in the discovery of a highly incriminating piece of evidence—a "smoking-gun." The Ninth Circuit observed in *Edwards:*

> [T]he vouching in this case was far more serious that in the ordinary circumstances: The prosecutor did not simply make one or two isolated statements regarding the credibility of a particular witness. Instead, he repeatedly vouched for the reliability of a key piece of evidence, both by presenting witnesses to verify that the receipt was not planted, and by arguing that it was a bona fide piece of evidence. In effect, the prosecutor functioned throughout the second half of Edwards's trial as a silent witness for the prosecution. Unlike other witnesses, however, he was not subject to cross-examination and the jury members never had the opportunity to evaluate for themselves whether his story was to be believed.

*Id.* at 923. Unlike *Edwards,* here the prosecutor's implication that he had personal knowledge that Myrick said he had been threatened was called into doubt by Myrick's denial of this fact.

Furthermore, Myrick's prior inconsistent statement implicating appellant was not of the same "smoking gun" nature as the receipt in *Edwards.*[13] Without the receipt, the State had no way to link Edwards to the black bag containing the drugs. Here, there was plenty of evidence linking appellant to the crime, even in the absence of Myrick's testimony. The police observed appellant at the scene of both drug transactions and found drug-enforcement funds used in those drug buys on his person and on his passenger. The trial court did not abuse its

---

13. The prosecutor sought to prove that Myrick had been threatened by appellant in order to encourage the jury to believe Myrick's prior statement implicating appellant, rather than his exculpatory in-court testimony.

discretion in refusing to grant appellant's motion for a mistrial.

## III.

### Denial Of Appellant's Motion In Limine

Appellant also takes issue with the trial court's denial of his motion in limine seeking to exclude any testimony regarding Myrick's statement made to Carafano at the restaurant that, "My supplier is out back." He argues that the court erred in admitting references to this statement under Md. Rule 5–803(a)(5), the co-conspirator exception to the hearsay rule.

Appellant argues that Md. Rule 5–803(a)(5) does not apply to the statement because there is nothing to indicate that it was made "in furtherance of [a] conspiracy," as required by the rule. He argues that the statement was made during "transactions ... between Carafano and Myrick alone" and was "more akin to non-incriminating portions of a declaration against interest." In reply, the State argues that the statement was properly admitted under Md. Rule 5–803(a)(5), stating that "[t]he 'furtherance' requirement has been 'interpreted broadly.' "

Md. Rule 5–803(a)(5) provides for the admissibility, when offered against a party, of "statements by a coconspirator of the party during the course and in furtherance of the conspiracy."

> A criminal conspiracy consists of the combination of two or more persons to accomplish some unlawful purpose, or to accomplish a lawful purpose by unlawful means. The essence of a criminal conspiracy is an unlawful agreement. The agreement need not be formal or spoken, provided there is a meeting of the minds reflecting a unity of purpose and design. In Maryland, the crime is complete when the unlawful agreement is reached, and no overt act in furtherance of the agreement need be shown.

*Townes v. State,* 314 Md. 71, 75, 548 A.2d 832 (1988).

As recognized by the State, the requirement that the statement be made "in furtherance of" the conspiracy is

interpreted broadly. *See Irvin v. State,* 23 Md.App. 457, 472, 328 A.2d 329 (1974), *aff'd,* 276 Md. 168, 344 A.2d 418 (1975). In *Irvin,* quoting from Levie, *Hearsay and Conspiracy,* 52 Mich. L.Rev. 1159, 1168 (1954), we said: " 'If *some* connection is established between the declaration and the conspiracy then the declaration is taken as in furtherance of the conspiracy.' " *Id.* at 473, 328 A.2d 329; *see also Terrell v. State,* 34 Md.App. 418, 425, 367 A.2d 95 (1977)("any statement made or act done by [a conspirator] in furtherance of the general plan and during the life of the conspiracy is admissible against his associates and such declarations may be testified to by third parties as an exception to the hearsay rule") (citations omitted).

In ruling on appellant's argument that the statements were not in furtherance of the conspiracy charged, the court commented:

But isn't [the statement at issue] an explanation of what [Myrick] is going to do next.... [Carafano] ... gives him the money and then he says, "My supplier is out back," and leaves ... presumably or inferentially to go get the drugs to satisfy the transaction with the payment of money.... I think it is [in furtherance of the conspiracy]. I will deny the motion in limine.

■ Under the broad rule set forth in *Irvin,* we see no error in the court's determination that the statement, "My supplier is out back," had enough connection to the conspiracy to warrant its admission. The court did not abuse its discretion in admitting the statement. *See Smallwood v. Bradford,* 352 Md. 8, 27, 720 A.2d 586 (1998)("it is well settled that the admission of evidence, including the determination of its relevance, is committed to the considerable and sound discretion of the trial court").

Appellant insists that there is nothing to indicate that the drug transactions in this case were part of a conspiracy between Myrick and appellant.

Each of the transactions was made between Myrick and Carafano alone. Carafano dealt with no one but Myrick.

The references to another "guy" did not induce Carafano to do anything or not do anything. Carafano only cared about when and where Myrick told him to show up. . . . The utterances were simply gratuitous statements. They are no different than if Myrick had said to Carafano, "If you get arrested, I am telling you now, I got these drugs from Earl Walker."

We agree with the State that appellant ignores the fact that the State's theory of conspiracy was that Myrick acted as the "middleman," arranging drug transactions between appellant and potential buyers. Contrary to appellant's characterization of Myrick's comment to Carafano that his "supplier is out back," as gratuitous, we agree with the trial court that this statement was, indeed, made in furtherance of the alleged conspiracy between Myrick and appellant. The trial court exercised proper discretion in admitting the statement.

The two cases cited by appellant, *Brown v. State*, 317 Md. 417, 564 A.2d 772 (1989), and *Adkins v. State*, 72 Md.App. 493, 531 A.2d 699 (1987), *rev'd*, 316 Md. 1, 557 A.2d 203 (1989), do not deal with the co-conspirator exception to the hearsay rule, and thus do not sway us from our decision announced above.

## IV.

### Sufficiency Of The Evidence

Finally, appellant asserts that the evidence presented at trial was insufficient to support both his distribution and conspiracy to distribute convictions. The State responds that this issue was not properly preserved and therefore we should not address it. Alternatively, the State urges that the evidence presented was sufficient to support appellant's convictions.

We first address the State's contention that appellant failed to preserve a sufficiency of the evidence challenge before this Court. As we explained in *Anthony v. State*, 117 Md.App. 119, 699 A.2d 505, *cert. denied*, 348 Md. 205, 703 A.2d 147 (1997),

[i]n a criminal action, when a jury is the trier of fact, appellate review of sufficiency of evidence is available only when the defendant moves for judgment of acquittal at the close of all the evidence and argues precisely the ways in which the evidence is lacking. The issue of sufficiency of the evidence is not preserved when appellant's motion for judgment of acquittal is on a ground different than that set forth on appeal.

*Id.* at 126, 699 A.2d 505(citations omitted).

■■■ Here, at the close of all the evidence, appellant made a motion for acquittal.

Your Honor, I move for judgment of acquittal on all counts. Let me start first with the two counts concerning the May 3rd transaction, which are Counts 1 and 2 of the indictment.

Nobody testifies they see any exchange between my client and Myrick that day. Carafano didn't testify to that. All they have is money recovered the next day. There is no evidence as to when he got that money that is not in speculation and guessing. . . .

I would further suggest to the [c]ourt, the counts that involved conspiracy to distribute, which are Count 2 and Count 4, allege a conspiracy to distribute between [appellant] and Myrick.

There is such a thing, Your Honor, as a conspiracy to possess, and I could have had litigation about this before. Conspiracy to possess, assuming [appellant] gave Myrick cocaine on May 3rd and May 4th, does not make a conspiracy to distribute; and, if Walker actually did give drugs to Myrick, that doesn't mean there is a conspiracy between them to further that transaction or distribute beyond [appellant] and Myrick.

So there is no conspiracy to distribute, and I think, given the amendment that the State made to the indictment, given the fact that it is limited to [appellant] and Myrick and there is a conspiracy to distribute, not a conspiracy to

possess, we have no testimony that that is a [distributable] amount, that, that [it] is not for personal use.

I think the [c]ourt has got to grant my motion on [Count 2] and [Count 4]. I think, certainly, the [c]ourt has got to grant my motion as to the May 3rd incident, Counts 1 and 2.

The trial court thereafter denied appellant's motion. Although the motion for acquittal encompassed "all counts," the specific points argued by appellant's attorney challenged only Counts 1 (distribution—May 3), 2 (conspiracy to distribute—May 3), and 4 (conspiracy to distribute—May 4). Appellant was acquitted of the May 3 counts. Appellant's counsel did not detail why appellant should be acquitted of Count 3 (distribution—May 4). Even though his motion challenged "all counts," appellant's trial attorney, in arguing the motion, discussed only the sufficiency of the evidence surrounding the May 3 transaction, as grounds for acquitting on the distribution charges. *See* Md. Rule 4–324(a); *Muir v. State*, 308 Md. 208, 218, 517 A.2d 1105 (1986)(failure to particularize reasons for motion results in failure to preserve issue for appellate review). Although the majority of appellant's argument on appeal challenges the sufficiency of the evidence to convict on the May 4 distribution charge, we must conclude that appellant has not preserved this particular challenge. We will not address it. That leaves only the sufficiency challenge to Count 4 (conspiracy to distribute—May 4).

Appellant challenges the sufficiency of the evidence regarding the conspiracy to distribute charge only as an afterthought, stating, without any support, "[s]imilarly, there is [insufficient] evidence to indicate that [appellant] and Myrick conspired together to distribute the cocaine."

The standard for our review of the sufficiency of the evidence is "whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *see White v. State*, 363 Md. 150, 162, 767 A.2d 855 (2001). "Weighing the

credibility of witnesses and resolving any conflicts in the evidence are tasks proper for the fact finder." *State v. Stanley,* 351 Md. 733, 750, 720 A.2d 323 (1998).

As stated in section III, *supra,* "[t]he essence of a criminal conspiracy is an unlawful agreement. The agreement need not be formal or spoken, provided there is a meeting of the minds reflecting a unity of purpose and design." *Townes v. State,* 314 Md. 71, 75, 548 A.2d 832 (1988). No overt act in furtherance of the agreement is required to support a conspiracy conviction. *See Anthony,* 117 Md.App. at 126, 699 A.2d 505.

We hold that there is sufficient evidence in the record to support appellant's conspiracy to distribute conviction arising out of the May 4 transaction. Among the evidence from which the jury could infer an "unlawful agreement" between Myrick and appellant is the following: Carafano's testimony that Myrick stated he had to call "his guy" and would call Carafano back to finalize the deal, that "his guy" would be at the pizza restaurant on May 3, and that he had to walk down the street and get the drugs from "his guy" on May 4; appellant's presence at the scene of both the May 3 and May 4 transactions; the officers' observations of appellant and Myrick interacting on May 4; the presence of pre-recorded drug enforcement funds from the May 3 transaction in appellant's wallet; and the presence of the $50 in pre-recorded funds from the May 4 transaction on the person of the passenger in appellant's car on May 4. From this evidence, a jury could infer that there was an unlawful agreement between appellant and Myrick to distribute cocaine. A rational trier of fact could have found the elements of the crime beyond a reasonable doubt, and we will not disturb that determination.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**