818 A.2d 1078

Earl WALKER

v.

STATE of Maryland.

No. 53, September Term, 2002.

Court of Appeals of Maryland.

March 12, 2003.

362

David A. Martella (Barry H. Helfand, on brief), Rockville, for petitioner.

Steven L. Holcomb, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Md., on brief), Baltimore, for respondent.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

HARRELL, Judge.

## I.

In May 2000, the Montgomery County Police Department arranged a series of undercover drug buys from Gerald Myr-

ick, a target of an investigation. The undercover agent assigned to plan and carry-out the buys was Officer Charles Carafano. Carafano initially arranged to purchase $100 worth of crack cocaine from Myrick at the pizza restaurant where Myrick worked in Derwood, Maryland. Myrick told Carafano to arrive at approximately 7pm on 3 May 2000 because "his guy" also would be there around 7pm. When Carafano arrived in front of the restaurant, Myrick took the $100 from him and, before retreating into the restaurant, told him that "his guy" was out back. Shortly thereafter, surveillance officers observed a silver Honda with temporary registration tags depart from the rear of the restaurant. Several minutes after the Honda departed, Myrick emerged from behind the restaurant and handed Carafano three rocks of crack cocaine wrapped in cellophane. At trial, Carafano identified Petitioner, Earl Walker, as the driver of the Honda.

Carafano arranged to buy another $50 worth of crack cocaine on the next day. Myrick and Carafano agreed to meet at Myrick's house after work. Myrick met Carafano on the stoop in front of his house and, after receiving $50 from Carafano, walked down the street. Carafano's colleague, Officer Helton, was surveilling the area. He observed Myrick meet with another man, later confirmed to be Roland Christian, at the street corner where they waited until the silver Honda drove-up. Myrick approached the driver's side of the Honda while Christian approached the passenger's side. Helton claimed that he saw Myrick reach into the driver's side window while Christian reached into the passenger's side window. They then withdrew their hands and placed them in their pockets. The Honda drove away. At trial, Helton identified the driver of the Honda as Walker. Twenty minutes after Myrick had left Carafano on the stoop, he returned and handed Carafano three rocks of wrapped crack cocaine.

A third officer was tasked with following the Honda and pulled it over after the drug deal was completed. In a search of the car, a wallet was recovered from the driver's seat containing several credit cards bearing Petitioner's name and $240 in cash, $70 of which was confirmed to be from the

marked bills given Myrick for the 3 May 2000 drug transaction at the pizza restaurant. A search of the Honda's passenger recovered the $50 from the 4 May 2000 drug deal.

Myrick was compelled to testify at Petitioner's trial in the Circuit Court for Montgomery County[1] after being promised immunity from state and federal prosecution for his part in the events. Prior to the trial and pursuant to a plea agreement, Myrick gave an oral statement to the police implicating Petitioner. At the start of Walker's trial, however, the prosecutor proffered that she had learned that Myrick was no longer willing to testify and so she moved to compel Myrick's testimony. The court delayed ruling on the motion until after the jury was selected. Outside the presence of the jury, the prosecutor called Myrick to the stand at which time he exercised his Fifth Amendment rights and indicated that he would refuse to testify. After both state and federal immunity from prosecution were secured for Myrick, the court granted the State's motion to compel and Myrick took the stand to testify before the jury.

Myrick gave the following testimony, in pertinent part:

[PROSECUTOR]: [D]id you meet with [Officer Carafano] for the purpose of distributing to him cocaine?

[MYRICK]: Yes.

Q: Did you make arrangements for him to meet you at [the restaurant] for that same transaction?

A: Yes.

Q: And, when you met with Officer Carafano, did he provide you with money?

A: Yes, he did.

Q: And did you go back into the [pizza] store?

A: I believe I did, or I walked around the store.

Q: And where were you going?

---

1. Walker was charged with two counts regarding the events of 3 May 2000, Distribution of Cocaine and Conspiracy to Distribute Cocaine, and one count each of Distribution of Cocaine and Conspiracy to Distribute Cocaine for the 4 May 2000 activities.

A: To go pick up the stuff that I had on the ground.

Q: Where did you pick that stuff up?

A: It was right behind [the restaurant].

Q: And was there anybody behind [the restaurant] when you went back there?

A: Yes.

Q: Who was behind there?

A: Earl Walker.

Q: And did he provide you with that cocaine?

A: No.

Q: What was he doing back there, do you know?

A: I had owed him some money. I had told him when I get off work, I would pay him.

Q: And did you pay him the money that you had owed him?

A: Yes, ma'am.

Q: After you came back from [the restaurant], did you give the cocaine to Officer Carafano?

A: Yes, I did.

The prosecutor then announced her intention to impeach Myrick with his prior statement to the police implicating Petitioner. The statement, although reduced to a writing, was not signed or otherwise adopted previously by Myrick. The prosecutor acknowledged that "[w]e cannot get this statement in as substantive evidence under the *Nance* case [*Nance v. State*, 331 Md. 549, 629 A.2d 633 (1993) (holding admissible as substantive evidence the factual portions of prior inconsistent statements reduced to writing and signed by a "turncoat witness" who later repudiated those statements at trial)] and the new rules that came along from *Nance* which do require that any prior inconsistent statement be signed by the individual prior to it being admitted into evidence as substantive evidence." When the court asked the prosecutor whether she was "taken by surprise by [Myrick's] testimony," she replied "[t]his is the first I have heard this particular version." The court also heard from defense counsel who was skeptical about

the prosecutor's alleged "surprise." He stated "I think in all fairness, the State [k]new there was going to be problems with Myrick—so, to now claim surprise, I just think is a little poor."

The court found that the State was surprised by Myrick's in-court testimony and permitted the State to attempt to impeach him. The prosecutor continued her examination of Myrick:

[PROSECUTOR]: Mr. Myrick, do you remember giving a statement to the police ... on the night of your arrest on May 4th of this year?

[MYRICK]: Yeah, partially; yes, ma'am.

Q: And do you remember in that statement indicating "I got [a] $100 rock of crack cocaine from Earl or Eric, drives a silverish colored Honda." I have the statement if you want to see it?

A: Okay. I remember telling him from him bugging me, I remember of some sort. It is not really clear to me, because I was pretty much beat up at the time.

Q: But—

A: So I don't know exactly what I was—you know, I haven't even really seen the statement myself. So I don't know.

Q: Well, that is not true. I showed you the statement on Friday, did I not? ...

[DEFENSE COUNSEL]: Objection to the form of the question.

[MYRICK]: I don't know.

[COURT]: Sustained.

[PROSECUTOR]: Mr. Myrick, were you not shown this—

A: Oh, yes.

Q: —statement on Friday?

A: This one here, yes, I was.

Q: And did you not tell the police "I got $100 rock of crack cocaine from Earl or Eric, drives a silverish colored Honda?"

A:   Yeah, I did say this on this thing.

The prosecutor continued her questioning of Myrick:

[PROSECUTOR]: Mr. Myrick, you and I met on Friday; is that correct?

[MYRICK]: Yes, ma'am.

Q:   And at that time I gave you a copy of your statement, did I not?

A:   Yes, ma'am.

Q:   And did I not ask you at that time whether this statement was the truth?

A:   Yes, ma'am.

[DEFENSE COUNSEL]: Objection.  Can I approach the bench?

[Whereupon bench conference followed]

[DEFENSE COUNSEL]: Your Honor, based on the question [the prosecutor] just asked, what she did and what her contact with Mr. Myrick is, I am going to ask the Court for a mistrial because it puts her as a witness in this case and I don't think she can continue on.  It violates all right to confront evidence in this case as to what she said to him and what she did.  So, I am going to move for a mistrial.

[THE COURT]: I don't think this is the test.  I think the test is she simply stuck with his answers.  That is all.  I don't think it makes her a witness in the case.  I will overrule your objection and deny your motion to mistrial.

[Whereupon the bench conference was concluded]

[PROSECUTOR]: Mr. Myrick, do you remember the question?

[MYRICK]: I don't remember.

Q:   [Y]ou reviewed the statement on Friday; is that correct?

[MYRICK]: Yeah, approximately, yeah.

Q:   And at that time did I not ask you whether this was a true statement?

A:   Yes, you did ask me that one.

Q: And at that time did you say anything to me—

A: No, I didn't say anything to you about it.

Q: Mr. Myrick, you did not want to testify today; is that correct?

A: No, I didn't want to testify today.

Q: And, in fact, you are here by subpoena; is that correct?

A: Yes, ma'am.

Q: And, in fact, you have been ordered to testify; is that correct?

A: Yes, ma'am.

Q: And you are afraid; is that correct?

[DEFENSE COUNSEL]: Objection.

[COURT]: Sustained. Leading.

[PROSECUTOR]: Have you been threatened in any way—

A: No.

Q: Did you tell me on Friday that you had been?

[DEFENSE COUNSEL]: Objection. Your Honor, can I approach the bench now, please?

[COURT]: All right.

[Whereupon bench conference followed]

[DEFENSE COUNSEL]: Your Honor, I move for mistrial, again. The suggestion now from that question is that my client—even if he was threatened, whatever his answer is— that my client was involved in something like that. That is unfair—

[COURT]: He has already said he wasn't threatened. I will sustain the objection. I will deny the motion.

[DEFENSE COUNSEL]: Your Honor, I would ask the Court to disallow the State pursuing this avenue of question in where it is suggested that my client is involved in any way in his statements to [prosecutor], to his statements to the officers that night. He gave his reasons—

[COURT]: He has already said—you are stuck with his answer—he said he wasn't threatened. So I am not going

to let you pursue that unless you have some particular evidence that you—

[PROSECUTOR]: Your Honor, when I met with him on Friday, in Mr. Schmidt's presence, Mr. Myrick said that his father—his elderly parents—had been threatened, and I am not suggesting—I mean, I don't know whether it is Mr. Walker—I am not sure if it is really important who has threatened him, but that is why he told me on Friday that he no longer wanted to cooperate, and he did not want to testify.

And I think, given the fact that I now have a witness who is totally changing their story, and I believe, not being truthful, I think I can bring out the fact that he is making all this up now.

[COURT]: Well, that is true. You can do that, but you have already asked him if he was threatened and he said he wasn't.

[PROSECUTOR]: But why can I not ask him when I met with him on Friday in the presence of Mr. Schmidt, whether he told me at that time he had been threatened or not and that is why he didn't want to testify and he can say yes or no.

[DEFENSE COUNSEL]: This is extrinsic; this is collateral. You know, we come into the situation where surprise is claimed and now you keep getting all the extra stuff with it that has nothing to do with it.

[COURT]: But their testimony bolsters the State's argument for surprise. I will allow that question. I will overrule the objection.

[Whereupon the bench conference was concluded]

Q: Mr. Myrick, when I met with you on Friday, didn't you tell me that you had been threatened?

A: No, I don't recall. I don't remember.

Q: You don't recall telling me that?

A: No, . . .

Q: And did you not tell me that you didn't want to testify?

A: Yes, I did tell you I didn't want to testify because—

Q: Because you were afraid?

A: No, because the statement I wrote was a lie, and I am not going to convict somebody with my wrongdoings.

Q: That is what you told me on Friday.

A: No. That is what—I didn't tell you anything. . . .

Q: Mr. Myrick, on Friday, when we met in the presence of your lawyer . . . you knew I was a State's Attorney, did you not?

A: Right. Yeah. I just wanted to hear what you were trying to say to me.

Q: And did you not tell me that day that you had been threatened and that is why you didn't want to testify?

[DEFENSE ATTORNEY]: Objection.

[THE COURT]: Sustained.

Walker ultimately was acquitted of the counts relative to the 3 May 2000 episode, but convicted of the charges pertaining to the 4 May 2000 transaction. The court imposed concurrent sentences of five years on each conviction, with all but eighteen months suspended, followed by three years of supervised probation.

## II.

The flagship issue of Petitioner's appeal to the Court of Special Appeals questioned whether the State may impeach its own witness with a prior inconsistent statement, under Maryland Rule 5–607 (2000), when the State is not surprised by the witness's testimony.[2] *Walker v. State,* 144 Md.App. 505, 509,

---

**2.** There were actually a total of four questions put to the Court of Special Appeals: (1) Did the trial court err by allowing the State to impeach its own witness with a prior unsworn statement when the State was not surprised by that witness's testimony?; (2) Did the trial court err in denying appellant's request for a mistrial?; (3) Did the trial court err in denying appellant's motion *in limine* to exclude all hearsay statements made by a non-defendant during a drug transaction about having to contact "his guy"?; and (4) Was the evidence sufficient to convict appellant of the charges stemming from the May 4 transaction?

798 A.2d 1219, 1221 (2002). Walker asserted that the State's impeachment of Myrick with his prior inconsistent statement was improper because the State was not "surprised" by his exculpatory testimony at trial. Apparently, Walker believed that the prosecutor's statement "[t]his is the first time I have heard this particular version," denoted a lack of surprise. Relying on *Spence v. State*, 321 Md. 526, 530, 583 A.2d 715, 717 (1991), Walker alleged that the State called Myrick as a witness merely as a "subterfuge to admit, as impeaching evidence, otherwise inadmissible hearsay." The State objected to Walker's characterization of the prosecutor's comment and argued that the prosecutor's reasonable expectation was that the shelter offered by immunity from prosecution should have resulted in Myrick giving testimony at trial consistent with the statement he gave to the police. Therefore, the prosecutor was surprised that Myrick did not testify as expected.

The Court of Special Appeals held that a party is not required to demonstrate surprise before impeaching its own witness; rather, the only limit on a party's impeachment of its own witness is the subterfuge limitation which it concluded was not violated in this case. To reach its conclusion, the intermediate appellate court reviewed the history and purpose of the common law "voucher rule," explaining that the rule was predicated on the notion that "a party calling a witness 'vouched' for the credibility of that witness." 144 Md.App. at 517, 798 A.2d at 1225. The court noted the development of an exception to the voucher rule permitting a party to call a witness otherwise excluded by the voucher rule if the party could demonstrate that it was surprised by the witness's testimony. *Id.* Only pursuant to the surprise exception to the voucher rule could a party impeach it's own witness. The court also observed that Maryland Rule 5-607, originally adopted in 1989 as Maryland Rule 1-501, eliminated the

---

We shall review here the intermediate appellate court's opinion only as to the first two issues as they are the only ones implicated by the questions posed in Petitioner's successful certiorari petition in this Court.

voucher rule by providing that "[t]he credibility of a witness may be attacked by any party, including the party calling the witness." Md. Rule 5–607. Of additional significance to the court's analysis was our decision in *Spence* which limited the use of prior inconsistent statements to impeach a party's own witness by precluding the State from calling a witness "who it knows will contribute nothing to its case, *as a subterfuge to admit, as impeaching evidence, otherwise inadmissible hearsay evidence.*" 321 Md. at 530, 583 A.2d at 717 (emphasis added); *Walker,* 144 Md.App. at 518, 798 A.2d at 1226. The court aptly observed that, in *Bradley v. State,* 333 Md. 593, 636 A.2d 999 (1994), we extended our ruling in *Spence* by holding that "the State may not, when questioning its own witness, enter a clearly 'independent area of inquiry ... for the sole purpose of impeaching the witness in the clearly separate area.'" *Walker,* 144 Md.App. at 519, 798 A.2d at 1227 (quoting *Bradley,* 333 Md. at 605, 636 A.2d at 1005).

The Court of Special Appeals reasoned further that because the surprise exception was developed to limit the harsh application of the voucher rule, the elimination of the voucher rule necessarily meant that the surprise exception to that rule also was no longer material to the analysis of cases where a party sought to impeach its own witness. 144 Md.App. at 519, 798 A.2d at 1227.[3] The intermediate appellate court noted that there may be, however, a relationship between the subterfuge limitation discussed in *Spence* and *Bradley* and surprise such that a demonstration by the State that it was surprised by it's witness's trial testimony necessarily indicated that the prosecutor could not be introducing the prior statement solely as a subterfuge. 144 Md.App. at 520, 798 A.2d at 1227. The court therefore read *Bradley* not as requiring surprise as a prereq-

---

**3.** The Court of Special Appeals noted that Maryland Rule 5–607 (2002) is a verbatim adoption of Federal Rule of Evidence 607. The court observed that the federal courts and states that have adopted rules that are verbatim replications of the federal rule, like Maryland, have refused to read a surprise requirement into the rule. For citation to other state court cases refusing to require surprise for a party to impeach its own witness, see *Walker v. State,* 144 Md.App. 505, 526–27, 798 A.2d 1219, 1231–32.

uisite to a party's impeachment of its own witness, but that the prosecutor's line of questioning must not be a subterfuge to admit otherwise inadmissible evidence.

It was suggested by our intermediate appellate colleagues that the subterfuge limitation to Md. Rule 5–607 does not apply unless the State has full, advance knowledge that the witness will recant his or her prior statement at trial. 144 Md.App. at 523, 798 A.2d at 1229. In this regard, the court alluded to one of its earlier cases where the prosecutor had partial, but not full, knowledge that the witness might recant his testimony, *Pickett v. State,* 120 Md.App. 597, 707 A.2d 941 (1998). In that case, the court applied the balancing test of Maryland Rule 5–403 [4] to weigh the probative or impeachment value of the witness's prior inconsistent statement against any unfair prejudicial effect on the defendant in deciding whether to admit the prior statement for impeachment purposes under Rule 5–607. *Pickett,* 120 Md.App. at 605–07, 707 A.2d at 945–46. The Court of Special Appeals advocated evaluating the witness's testimony as a whole to determine if the testimony is "useful to establish any fact of consequence significant in the context of the litigation, [then] the witness may be impeached by means of a prior inconsistent statement as to any other matter testified to." 144 Md.App. at 528, 798 A.2d at 1232 (quoting JOHN W. STRONG, MCCORMICK ON EVIDENCE § 38, at 142 (5th ed.1996)). When the prosecutor has full knowledge that a witness " 'will contribute nothing to [the State's] case,' calling that witness with the primary purpose of placing before the jury his or her prior inconsistent statement will be considered a subterfuge." 144 Md.App. at 528, 798 A.2d at 1232 (quoting *Spence,* 321 Md. at 530, 583 A.2d at 717).

Finding that the voucher rule and its surprise exception are no longer part of Maryland law, the court concluded in Walker's case that the prosecutor's mere knowledge that Myrick

---

4. Maryland Rule 5–403 (2003) provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

was unwilling to testify did not mean that the State called him to the stand merely as a subterfuge to gain admission of his prior statement implicating Walker. There were, the court found, other legitimate reasons for calling Myrick to testify. 144 Md.App. at 530, 798 A.2d at 1233. For example, Myrick's testimony corroborated the testimony of the police regarding the May 3 events that Walker was present at the scene of the drug transaction and received some of the proceeds from the transaction. *Id.* The court concluded that the State did not violate the rule in *Bradley* that "the State may impeach those portions of a witness's testimony that do not comport with the prosecution's theory of the case" only if "the area of inquiry is not clearly independent." *Bradley,* 333 Md. at 604, 636 A.2d at 1005; *Walker,* 144 Md.App. at 532, 798 A.2d at 1234. Myrick testified at trial that the money he gave Walker on May 3 was money owed him from a prior debt, thus undermining the inference that Walker was involved in the drug transaction and facilitating the need to impeach Myrick's testimony insofar as it was inconsistent with his prior statement to the police. *Id.* The court concluded that the prior inconsistent statement damaged his credibility with regard to the new statement, and thus, was probative evidence. *Id.*

Walker asserted that the trial court failed to weigh the probative value of Myrick's prior statement against its prejudicial effect on Walker because the court did not consider the statement specifically before authorizing its use to impeach Myrick. The State pointed-out that at an earlier hearing on a motion in limine the court was informed as to the substance of Myrick's statement to the police. 144 Md.App. at 533, 798 A.2d at 1235. By later allowing the statement to be used to impeach Myrick, the State argued, the court impliedly determined the probative value of the impeaching statement outweighed its prejudicial effect on appellant. *Id.*

The Court of Special Appeals, referring to its *Pickett* decision, defined probative value as the "likelihood of actually damaging the witness's credibility." *Id.* The test for determining the probative value of Myrick's testimony became the same test for determining whether the prosecution called the

witness as a subterfuge—"whether the witness has something useful to contribute to the prosecution's case other than the introduction of his prior inconsistent statement." *Id.* The court noted that the prejudice component of the balancing test required consideration of whether the evidence prejudiced the defendant unfairly or misled or confused the jury. Finding that even though the record in this case did not reflect whether the trial court explicitly conducted a balancing test, the court deferred to the "strong presumption that judges properly perform their duties" and held that application of the Rule 5–403 balancing test "compels the conclusion that Myrick's prior inconsistent statement was not introduced as mere subterfuge," and the trial court did not err in allowing the State to use the statement for impeachment purposes. 144 Md.App. at 535, 798 A.2d at 1236.

The Court of Special Appeals then turned to Walker's second assertion of error, the trial court's denial of his request for a mistrial after the prosecutor questioned Myrick about a meeting between the prosecutor and Myrick. *Id.* Reiterating our standard for the review of a trial court's disposition of a motion for a mistrial, the court observed that appellate review "is limited to whether the trial court abused its discretion in denying the motion for mistrial," and the trial court will not be reversed "unless the defendant clearly was prejudiced by the trial court's abuse of discretion." 144 Md.App. at 536, 798 A.2d at 1237 (quoting *Klauenberg v. State,* 355 Md. 528, 555, 735 A.2d 1061, 1075 (1999)).

Walker, relying solely on *United States v. Edwards,* 154 F.3d 915 (9th Cir.1998), asserted to the Court of Special Appeals that during the course of her examination the prosecutor was allowed to testify as a State's witness without being called as such or being subject to cross-examination. The State contested the relevance of *Edwards* and contended that the prosecutor in the instant matter, unlike the prosecutor in *Edwards,* " 'engaged in proper cross-examination on a point critical to explaining Myrick's in-court recantation of his statement to police in which he had incriminated Walker as the person who supplied him with the cocaine that he sold to' the

undercover officer on the dates in question." 144 Md.App. at 538, 798 A.2d at 1238. The Court of Special Appeals found significant differences between *Edwards* and the present case warranting a different result here. The court concluded that the trial court did not abuse its discretion in refusing to grant Walker's motion for a mistrial. 144 Md.App. at 541–42, 798 A.2d at 1239–40.

### III.

We granted certiorari on Walker's petition to consider whether, in order to impeach its own recanting witness, the State first must show surprise by the apparent recantation and whether the prosecutor's cross-examination of Myrick as to the pre-trial conversation between them provided grounds for a mistrial. 370 Md. 268, 805 A.2d 265 (2002). We hold that the trial court and Court of Special Appeals properly found that proof of surprise is not a necessary prerequisite under Md. Rule 5-607 analysis. As to the second question, however, the trial judge abused his discretion in denying defense counsel's request for a mistrial. The prosecutor's cross-examination of Myrick was improper prosecutorial conduct affecting Walker's right to a fair trial. A new trial is required.

### A.

Walker argues that the Court of Special Appeals's holding "clouds an important distinction between two separate issues: what is required before a party can call a witness to the stand, and what is required before a party may impeach its own witness with a prior inconsistent statement." Petitioner maintains that surprise should be a necessary element before a party may impeach its own witness. He characterizes the intermediate appellate court's holding as permitting a party to call a witness so long as the party has a "legitimate purpose" for calling the witness other than introducing a prior statement implicating the defendant. The "legitimate purpose" hurdle, according to Petitioner, is so low that it could be

overcome "in virtually every case and for every witness that is called to the stand." Myrick's testimony is an example, contends Petitioner, of testimony that is merely cumulative to that already presented and not material to the issues involved at trial. In this regard, Petitioner claims that the intermediate court incorrectly analogized the present matter to our decision in *Bradley* in finding Myrick's testimony admissible.

Walker also criticizes the Court of Special Appeals's finding that the prosecutor appropriately questioned Myrick about the subject areas which triggered the need for the impeaching examination. Again, he attacks the court's use of *Bradley*. Petitioner contends that the "independent area of inquiry" standard established in *Bradley* set forth a modified, albeit narrowed, version of the "voucher rule." Where the common law voucher rule prohibited a party from calling a witness who was expected to provide unfavorable testimony, *Bradley* narrows the scope of the exclusion to the expectations of individual questions, thereby restricting the State to asking its witness only questions expected to elicit favorable and probative responses. Questions that the State does not think will provide favorable responses, but only will trigger the need to cross-examine the witness with an otherwise inadmissible statement, cannot be asked, Petitioner suggests. Pursuant to his interpretation of *Bradley*, Walker explains that the element of surprise is still an important part of the "independent inquiry" analysis because surprise would indicate that the prosecutor did not have "full knowledge" that his or her questions would contribute nothing to the State's case.

Walker also claims that the court misread that part of *Bradley* which stated when "failure to inquire into a possibly independent area of inquiry could create a gap in the witness's testimony such that a negative inference may arise against the prosecution," the State is permitted to "fill such a gap by questioning and then impeaching the witness." *Bradley*, 333 Md. at 606, 636 A.2d at 1005–06. Petitioner alleges that the facts of his case and those in *Bradley* were sufficiently similar that the holding in *Bradley* that delving into an independent area of inquiry was improper mandates a reversal here. Fur-

thermore, Petitioner faults this Court in *Bradley* and the intermediate appellate court in *Walker* for not enunciating a clearer standard governing where an "independent line of inquiry" should be drawn. According to his reading, these decisions indicate that any question can be asked of a "turn-coat witness" until the point is reached where a question is asked expecting to elicit a recanting answer. At this point the trial judge is to evaluate whether the next question delves into an independent or dependent area of inquiry. Petitioner complains, however, that the cases are silent as to whether the answers elicited by the questions leading up to the recanting testimony should have been allowed. He postulates that if the independent area of inquiry is assessed based on the last question that was not expected to elicit a recanting response then "any creative prosecutor could craft a line of questioning that would close the 'gap' between the recanting portions of the testimony." The answer to this self-defined problem, from Walker's vantage, is only to allow a party to impeach its own witness when the party is surprised by an unexpected answer.

The State responds that the Court of Special Appeals correctly held that the State may impeach its witness with a prior inconsistent statement as long as the State did not call the witness as a mere subterfuge to introduce the prior statement. Respondent points to the language of Rule 5–607 as clear support for the court's holding: "[t]he credibility of a witness may be attacked by any party, including the party calling the witness." The subterfuge limitation, Respondent contends, is the only proper limitation on a party who seeks to impeach its own witness. If Petitioner's suggestion were adopted and a brightline rule created, the result would give new life to the voucher rule eliminated by the adoption of Rule 5–607. A further result would be that a party not surprised by its witness recanting or changing his or her story on the witness stand may not call that witness for any purpose or, if the witness were permitted to testify, the party may not impeach the recanting witness with a prior inconsistent state-ment. Respondent naturally agrees with the federal and state cases referred to by the intermediate appellate court refusing

to engraft a requirement of surprise onto Rule 5–607 or its other courts' equivalents.

The State maintains that Myrick was not called by the prosecutor as a subterfuge because Myrick had other useful information to impart on direct examination. Respondent finds Walker's appellate arguments to be inapposite to those he presented at trial regarding Myrick's importance to the proceedings. At trial, Walker argued that Myrick "[was] somebody necessary to the State's case," and he moved to dismiss the first two counts arising from the May 3 events if Myrick did not testify. Respondent therefore finds unpersuasive and contrary to Walker's statements at trial Petitioner's present allegations that Myrick's testimony was merely cumulative. The State also argues that the prosecutor's inquiry into why Myrick paid Walker the $100.00 was not an independent area of inquiry prohibited by *Bradley.* If calling Myrick was not a subterfuge, then impeaching him with his prior inconsistent testimony was permissible.

Respondent retorts that Petitioner's assertion that defense counsel should have been allowed to examine Myrick outside the presence of the jury does not provide a basis for reversal because Walker only suggested that course of action and did not object to the court's ruling denying that request.[5] Even if the issue had been preserved properly for review, the State contends the trial court properly exercised its discretion in permitting Myrick to testify in open court without first subjecting his anticipated testimony to scrutiny without the jury present. *See Bruce v. State,* 351 Md. 387, 393, 718 A.2d 1125, 1127 (1998).

Respondent continues to urge that the trial court weighed the probative value of Myrick's prior statement against its

---

5. The Court of Special Appeals agreed with the State that "appellant [Walker] acquiesced in the court's decision not to adopt that recommendation without further objection." *Walker,* 144 Md.App. at 516 n. 3, 798 A.2d at 1225 n. 3. *See Watkins v. State,* 328 Md. 95, 99–100, 613 A.2d 379, 381 (1992) (holding that where a party acquiesces in the court's ruling, there is no basis for appeal from that ruling).

potential prejudicial impact, correctly concluding that the pro-
bative value outweighed the potential for unfair prejudice.
Agreeing with the intermediate appellate court that the record
is unclear whether the trial judge reviewed the actual written
statement before it permitted the State to impeach Myrick
with its contents, the State argues nonetheless that there is a
strong presumption that trial judges know the law and per-
form their duties correctly and, regardless, the Court of
Special Appeals was correct that it would be inappropriate to
remand the case back to the trial court for that limited
purpose. Admitting that the prior inconsistent statement was
prejudicial to the defendant, though not unfairly so, the State
contends that the impeachment value of the statement was
considerable and outweighed the prejudice. Myrick's testimo-
ny affirmatively damaged its case, argues the State, because
his testimony indicated that his statement to the police was a
lie. Impeachment of his credibility therefore was important to
rehabilitate the State's case. Finally, Respondent asserts that
Walker's arguments mistakenly confuse substantive evidence
with impeachment evidence. Even though the prior inconsis-
tent statement would not be admissible as substantive evi-
dence, it is permissible to use it for impeachment purposes
because the purpose of the latter is to "attack the credibility of
a witness who has offered detrimental testimony," not to
provide substantive evidence of guilt. *Stewart v. State,* 342
Md. 230, 242, 674 A.2d 944, 950 (1996).

### B.

At common law the voucher rule provided that the party
calling a witness vouched for the credibility and veracity of
that witness's testimony. *Patterson v. State,* 275 Md. 563, 570,
342 A.2d 660, 665 (1975). The party calling the witness,
pursuant to the voucher rule, could not impeach or discredit
its witness by offering proof of prior contradictory statements.
*Id.* If the calling party became disappointed by the witness's
testimony or if the evidence adduced from the witness was not
beneficial to the calling party, he or she could not impeach the
witness without a showing of something more. *Poole v. State,*

290 Md. 114, 118, 428 A.2d 434, 437 (1981). If the witness's testimony at trial was contrary to prior statements made to the calling party and the statements involved facts material to the case, then the calling party could impeach its own witness upon a showing that the party was surprised by the witness's testimony. *Id.* "The Court should be satisfied that the party has been taken by surprise, and that the evidence is contrary to what he had just cause to expect from the witness based upon his statements, . . . ." *Murphy v. State,* 120 Md. 229, 233–34, 87 A. 811, 812–13 (1913). Once these prerequisites are satisfied, the witness may be cross-examined by the calling party as to his or her prior contradictory statements. *Poole,* 290 Md. at 119, 428 A.2d at 438.

The voucher rule is no longer a part of Maryland law.[6] Former Maryland Rule 1–501, now Maryland Rule 5–607, was adopted in 1989 and eliminated the voucher rule by providing that the credibility of a witness may be attacked by any party, including the calling party.[7] *See Spence,* 321 Md. at 528 n. 1, 583 A.2d at 716 n. 1. Following replacement of the voucher rule with Rule 5–607, debate commenced whether the surprise exception to the voucher rule continued to operate independently such that the party calling the recanting witness must be surprised by the witness's testimony as a prerequisite to attempting impeachment.

Petitioner relies on our holding in *Bradley* to support his argument that surprise still needs to be shown before a party may impeach its own witness. In *Bradley* the State charged

---

**6.** Nor is it part of federal law. Maryland Rule 5–607 was modeled on Federal Rule of Evidence 607 and is identical in verbiage. The commentary to the Federal Rule asserts that "[t]he rationale for the common-law rule was never very persuasive," and states that Rule 607 "recognizes that a party does not necessarily vouch for a witness; in fact, a party may have no choice but to call an adverse witness in order to prove a case."

**7.** The committee note to Rule 5–607 clearly states that "[t]his Rule eliminates the common law 'voucher' rule," and "[i]t does not permit a party to call a witness solely as a subterfuge to place an otherwise substantively inadmissible statement before the jury."

the defendant with kidnaping, armed robbery, and use of a handgun in the commission of a felony or crime of violence. The victim testified that a man approached her as she was getting out of her car, placed a gun against her stomach, forced her to drive several blocks before ordering her out of the vehicle, and absconded with her car. *Bradley,* 333 Md. at 596, 636 A.2d at 1001. As part of its effort to place the defendant in the victim's car at the time of the crime, the State proffered a phone bill reflecting calls made on the victim's car phone within thirty minutes following the theft. 333 Md. at 597, 636 A.2d at 1001. The State then called the defendant's cousin, Adrian Bradley, who testified that his home phone number matched the one listed on the victim's phone bill and that he had received one or two phone calls from the defendant at about the same time the victim's car was stolen. *Id.* In response to questions from the prosecutor, Adrian Bradley denied that he told the investigating detective that the defendant had told him during their phone conversations that defendant had stolen a car or that he responded by telling the defendant he was stupid for stealing the victim's car. *Id.* The State next called the detective who recounted his interviews with the defendant and his cousin. The detective recounted that Adrian Bradley told him that the defendant bragged about stealing a car during their phone conversations at the time of the theft. *Id.* The prosecutor told the court that he was not surprised by Adrian Bradley's testimony because, prior to trial, Adrian Bradley recanted the statements he made earlier to the detective. 333 Md. at 597–98, 636 A.2d at 1001. The trial judge permitted the jury to consider the detective's testimony regarding his conversation with Adrian Bradley, but only for impeachment purposes.

This Court concluded, however, that although the earlier part of Adrian Bradley's testimony was relevant and admissible, the latter portion was elicited solely to allow the State to impeach him through the use of otherwise inadmissible hearsay evidence and thus error entitling the defendant to a new trial. We held that "it is impermissible for a party in a criminal case, over objection, to venture into an independent

area of inquiry solely for purposes of 'circumventing the hearsay rule and parading inadmissible evidence before the jury.'" 333 Md. at 602, 636 A.2d at 1003 (quoting *Spence,* 321 Md. at 530, 583 A.2d 715). Furthermore, we held that "a defendant is denied a fair trial if the State, *with full knowledge that its questions will contribute nothing to its case,* questions a witness concerning an independent area of inquiry in order to open the door for impeachment and introduce a prior inconsistent statement." 333 Md. at 604, 636 A.2d at 1004 (emphasis added).

*Bradley* built upon *Spence.* In *Spence* the State called a witness, Cole, knowing he would contribute nothing to the State's case other than to get before the jury a hearsay statement implicating the defendant. When Cole did not testify as the State anticipated, the prosecutor called another witness to the stand to testify as to Cole's earlier statements regarding the defendant. The State admitted that the latter witness's testimony was inadmissible as substantive evidence and was only admissible to impeach Cole's prior testimony. *Spence,* 321 Md. at 530–31, 583 A.2d at 717. We found this maneuver by the State to be a "blatant attempt to circumvent the hearsay rule" and held that the State may not "call a witness who it knows will contribute nothing to its case, as a subterfuge to admit, as impeaching evidence, otherwise inadmissible hearsay evidence." *Id.* Our holding in *Spence* applied to the witness's testimony as a whole. Our holding in *Bradley* focused on discrete questions asked of the witness. *Bradley,* 333 Md. at 603, 636 A.2d at 1004. Pursuant to *Bradley,* even if the sole purpose in calling a witness is other than subterfuge, the questioning by a party of its own witness concerning an "independent area of inquiry" intended to open the door for impeachment and introduction of a prior inconsistent statement could be found improper. 333 Md. at 604, 636 A.2d at 1005.

We qualified our holding in *Bradley* by stating that "our holding is not applicable where there is no clearly independent area of inquiry or where failure to inquire into a possibly independent area of inquiry could create a gap in the witness's

testimony such that a negative inference may arise against the prosecution." 333 Md. at 606, 636 A.2d at 1005–06. As in *Spence,* the relevant factor in *Bradley* was whether the prosecutor had "full knowledge" that the witness intended at trial to recant his earlier statements to the authorities. The prosecutor in *Spence* admitted knowing that Cole would testify that Spence was not involved in committing the crime. He also admitted that his primary intent in calling Cole was to set the stage to impeach his testimony with his prior statements implicating Spence, though elicited from a follow-on witness. 321 Md. at 528, 583 A.2d at 716. The prosecutor in *Bradley* likewise indicated that he knew before trial that Adrian Bradley had recanted his prior statements to the police and quite possibly would do so on the witness stand. 333 Md. at 597–98, 636 A.2d at 1001. In *Bradley* we stated that "the State is still entitled to impeach a witness with a prior inconsistent statement if the witness's testimony comes as a surprise." 333 Md. at 606, 636 A.2d at 1006. The meaning attributed to this statement by Walker, however, is not the meaning we attribute to it.

■■■■■ Petitioner asserts that *Bradley* reinvigorates the surprise prerequisite as it existed under the voucher rule. We interpret *Bradley* to mean that a showing of surprise by the calling party is but one possible indication that the calling party did not have full knowledge that the witness would recant on the stand. In the absence of such knowledge, the party may impeach its own witness's testimony pursuant to Rule 5–607. As we stated in *Bradley,* if the State did not create the need to impeach its witness's testimony, then it is permitted to impeach its witness with a prior inconsistent statement. 333 Md. at 607, 636 A.2d at 1006. If a witness is called by a party to provide testimony helpful and relevant to that party's case and the witness's testimony is admissible, then the witness is permitted to testify. If a witness's testimony is intended to be relevant to the calling party's case, but the witness answers the calling party's question(s) in an unexpected manner, such that the calling party then seeks to impeach its own witness through his or her prior statements,

the determination must be made by the court, taking into account the entirety of the witness's testimony, whether the calling party called the witness merely as a subterfuge to permit impeachment evidence that advances the party's case or whether the calling party legitimately expected the witness would testify as he or she indicated prior to trial. If the witness's testimony is relevant to matters other than the "recanting" statements, then the witness was not called as a subterfuge and the question eliciting the "recanting" statements must be scrutinized to determine whether the question concerned an "independent area of inquiry." When the area of inquiry is clearly not independent, then "the State may impeach those portions of a witness's testimony that do not comport with the prosecution's theory of the case." 333 Md. at 604, 636 A.2d at 1005. Subterfuge, whether examined in terms of a witness's entire testimony or on a question-by-question basis, should not be permitted under our reasoning in *Spence* and *Bradley*.[8]

We agree with the intermediate appellate court's analysis of this issue.[9] Unlike the scenarios presented by

---

8. Petitioner's initial argument, that the "legitimate purpose" standard is too lax and undiscriminating, is flawed. There must be a legitimate purpose in calling a witness beyond merely as a means of putting before the jury inadmissible evidence used to impeach the calling party's own witness. Our discussion, *supra,* of the subterfuge and independent inquiry limitations on Rule 5–607 demonstrate that, although there must be a legitimate purpose for the testimony, it cannot be the result of subterfuge or for the purpose of conducting an independent inquiry once the witness has taken the stand. Furthermore, the threshold standards for calling any fact witness are merely that the witness have personal knowledge of the matter attested to and that the matter be relevant to the case at hand. *See* Maryland Rules 5–401, 5–402, and 5–602.

9. We also find guidance in the interpretation of Federal Rule of Evidence 607, the federal corollary to Md. Rule 5–607. Judge Posner, writing on behalf of the Seventh Circuit U.S. Court of Appeals, stated that Rule 607 would be abused if a party were to "call a witness that it knew would not give it useful evidence, just so it could introduce hearsay evidence ... in the hope that the jury would miss the subtle distinction between impeachment and substantive evidence—or, if it didn't miss it, would ignore it." *United States v. Webster,* 734 F.2d

*Spence* and *Bradley,* the witness in the present case, Myrick, provided testimony relevant to the State's case and the recanting portion of his testimony was not clearly an attempt by the prosecution to admit inadmissible inculpatory evidence. Viewed in a light most favorable to Walker, the inference that the prosecutor might have been suspicious that Myrick would give a different "version" in his testimony does not mean necessarily that the prosecutor called him merely as a subterfuge or that the pertinent line of questioning was an independent area of inquiry designed to open the door to admit otherwise inadmissible evidence to impeach Myrick's recanting statements. Like the witness in *Bradley,* Myrick possessed relevant testimony to offer aside from the statements amenable to impeachment. Unlike the witness in *Bradley,* however, the State in Walker's trial did not embark on an independent line of inquiry intending to elicit statements requiring impeachment. The prosecutor's pertinent line of questioning was intended to elicit information about the meeting between Myrick and Walker on 3 May 2000 at the pizzeria. Myrick's testimony departed from the prosecutor's expectations when he was asked about the transaction behind the pizzeria. The prosecutor anticipated that Myrick would testify that Walker gave him the cocaine in exchange for the money given Walker by Carafano. He departed from his statement to the police to that effect and instead said that he paid Walker for some unrelated debt behind the pizzeria and picked some cocaine up from the ground to give to Carafano. The prosecutor may

---

1191, 1192 (7th Cir.1984). The limitation on Rule 607, however, does not apply if the party calls the witness for a "good faith purpose" and the party does not expect the negative testimony. The calling party is then permitted to impeach its witness. *United States v. Peterman,* 841 F.2d 1474 (10th Cir.1988). A party may demonstrate surprise in order to prove that there was a good faith purpose in calling the witness, but it is not required. The Ninth Circuit U.S. Court of Appeals found that even when the calling party anticipates the need to impeach its witness with inadmissible evidence, the party may call the "rogue" witness if the witness's testimony is necessary to prevent the jury from drawing a negative inference against the party in the absence of the testimony. For example, avoiding such a negative inference was deemed a good faith purpose in calling a witness in *United States v. Gilbert,* 57 F.3d 709 (9th Cir.1995).

have been suspicious as to some things Myrick might say, but, on this record and without more, that does not imply solely that she had "full knowledge" that he was going to give that particular variation on his statement to the police at trial. In fact, the record reveals that the prosecutor had every reason to expect that Myrick would testify as anticipated. Although Myrick initially refused to testify at trial and indicated his intent to exercise his Fifth Amendment rights if called by the prosecution, the State secured both State and federal immunity from prosecution in order to ensure that Myrick would testify truthfully about the events implicating Walker.[10]

The series of questions from the prosecutor intended to elicit the testimony that Myrick had received the cocaine from Walker after giving him Carafano's money was not an "independent line of inquiry." Without those questions, the direct examination of Myrick would be incomplete and well could have lead the jury to draw inferences adverse to the State's case. The jury would be left wondering what happened behind the pizza restaurant where both Myrick and Walker were present—as Myrick testified. We agree with the Court of Special Appeals when it stated "[f]or the State to stop its questioning with the fact of payment, and not prove the reason for it, would paint an incomplete picture that might leave doubt in the jury's mind." *Walker*, 144 Md.App. at 532, 798 A.2d at 1234. Furthermore, even if the prosecutor had not been allowed to ask Myrick the questions eliciting the recanting testimony, Myrick's testimony was helpful and relevant to the State insofar as it corroborated Officer Carafano's testimony and established that Myrick did not have cocaine on his person when he went behind the pizzeria, but reappeared with cocaine shortly thereafter. It is clear that had testimony been allowed only on these points the jury would be left wondering where the cocaine came from and why Myrick was paying Walker if Walker did not give Myrick the cocaine.

---

10. The State specifically arranged for federal immunity in response to Myrick's request that he be given immunity from prosecution under sections 18 and 21 of the United States Code dealing with drugs and general criminal offenses.

Petitioner and Respondent naturally disagree as to whether the introduction for impeachment purposes of Myrick's prior statement to the authorities was more unfairly prejudicial than it was probative. Walker contends that, pursuant to the Court of Special Appeals's opinion in *Pickett v. State*, the trial judge was required to weigh the testimony's probative value against its "tendency to prejudice the defendant unfairly or to confuse the jury." 120 Md.App. at 605, 707 A.2d at 945. The intermediate appellate court correctly noted that the record was ambiguous as to whether the trial judge conducted such a balancing test, but that there is no requirement that the balancing test explicitly be performed on the record. As we stated in *Beales v. State*, 329 Md. 263, 273–74, 619 A.2d 105, 110 (1993) "[t]here is no requirement that the trial court's exercise of discretion be detailed for the record, so long as the record reflects that discretion was in fact exercised." [11] It was clear from the prosecutor's questions and the subsequent bench conference that the prior statement by Myrick was to the effect that Walker indeed had sold him the cocaine behind the pizzeria on 3 May 2000.

It is equally clear from the record that the trial judge weighed the prejudicial effect of the impeachment testimony against the probative value of that testimony in permitting its use as impeachment evidence and properly exercised his discretion. Myrick's prior statement obviously prejudiced Walker because the statement directly implicated Walker as a participant in the distribution of the cocaine. The mere fact that Myrick's prior statement was not advantageous to the defense at trial does not make it unduly or unfairly prejudicial within the meaning of the balancing test. The probative value of Myrick's prior statement, however, was significant because it indicated that Myrick had lied about his meeting with

---

11. Additionally, Petitioner did not preserve properly this issue for appellate review as Walker did not object at trial on these grounds. Pursuant to Maryland Rule 8–131(a), therefore, we are not obliged to decide this issue. *See Walker v. State*, 338 Md. 253, 262, 658 A.2d 239, 243 (1995) (stating that "[w]e ordinarily will not review an issue that was not presented to the trial court").

Walker and impeached his testimony at trial. The prejudice to Walker did not outweigh the considerable probative value of his prior statement and the trial judge therefore did not abuse his discretion.

## IV.

The second issue before us is whether the trial court erroneously denied Walker's request for a mistrial after the prosecutor "testified" at trial, in effect as a State's witness, about pre-trial conversations she had in her office with Myrick. Defense counsel, through his timely unsustained objections (see *supra* at 370 and 372) and timely-made, but denied, motions for mistrial (see *supra* at 370 and 371), properly preserved for appellate review the issue of whether it was proper for the prosecutor to question Myrick about statements he allegedly made to her during a pre-trial meeting. Defense counsel twice moved for mistrial during the prosecutor's direct examination of Myrick. Defense counsel predicated his first motion for mistrial on the basis that the line of questioning put the prosecutor "as a witness in this case," thus "violat[ing Walker's] right to confront evidence." In denying this motion, made at the inception of this line of questioning, the trial judge made clear his ruling that, in his view, the prosecutor was not "testifying." Walker moved for a mistrial a second time when the prosecutor's questions insinuated that Myrick was threatened by Walker.

Petitioner alleges that the form of the prosecutor's questions allowed her to testify without subjecting her to cross-examination by the defense. Walker contends that the assertions embedded in the prosecutor's questions likely were viewed by the jury with heightened credibility as she was an Assistant State's Attorney. The form of her questions allowed her to tell the jury that: (1) she met with Myrick in her office three days before trial; (2) Myrick told her he was afraid to testify; and (3) he had been threatened regarding his impending testimony. These assertions made clear to the jury that it should believe Myrick's prior statement because his trial

testimony to the contrary resulted from threats and intimidation from sources about which the jury was left to speculate.

Petitioner argues, as he did before the intermediate appellate court, that this case is similar to *United States v. Edwards,* 154 F.3d 915, 921–22 (9th Cir.1998) where the federal appellate court concluded that the prosecutor's involvement in discovering a piece of evidence introduced at trial may have prejudiced the defendant because jurors were likely to presume the prosecutor to be credible. The result of this scenario, argues Walker, is that if the jury believed the prosecutor it would have disregarded Myrick's in-court explanation and would have accepted his prior inconsistent statement as true. Its verdict therefore would be based improperly on the testimony of the prosecutor. Thus, the trial court erred by denying his request for a mistrial (*see supra* at 370).

Respondent argues that the line of questioning concerning the pre-trial meeting between the prosecutor and Myrick was proper cross-examination of a hostile witness and the trial judge correctly exercised his discretion to deny the requested mistrial based on that line of questioning. Respondent looks for support in our decision in *Lyba v. State,* 321 Md. 564, 569, 583 A.2d 1033, 1035 (1991), where we stated that it is proper for the trial judge to allow "any question which reasonably tends to explain, contradict, or discredit any testimony given by the witness in chief, or which tends to test his accuracy, memory, veracity, character, or credibility." *See Oken v. State,* 327 Md. 628, 669, 612 A.2d 258, 278 (1992) (stating that the scope of examination of witnesses at trial is a matter left to the discretion of the trial judge and no error will be found unless there is a clear abuse of discretion).

The important principles implicated by this second issue are the accused's right to a fair trial and the special duties imposed on public prosecutors. These principles often are intertwined such that when a prosecutor fails to fulfill his or her unique duties the criminal defendant is deprived of a fair trial.

Article 21 of the Maryland Declaration of Rights echoes the language of the Sixth Amendment to the United States Constitution, providing that "in all criminal prosecutions, every man hath a right . . . to be confronted with the witnesses against him. . . ." We stated in *State v. Collins,* 265 Md. 70, 288 A.2d 163 (1972), that "[t]he prerogative of the defendant to have his accusers confront him is a keystone to our concept of criminal justice—grounded on the unwavering belief that an individual should be afforded the opportunity to challenge the witnesses against him through cross-examination." 265 Md. at 76, 288 A.2d at 166. This guarantee provides criminal defendants with the opportunity to "cross-examine witnesses about matters relating to the witnesses' bias, interests, or motive to falsify." *Ebb v. State,* 341 Md. 578, 587, 671 A.2d 974, 978 (1996). This right of cross-examination is not absolute, however, and may be restricted under appropriate circumstances by the trial judge in the sound exercise of his or her discretion. *State v. Cox,* 298 Md. 173, 183, 468 A.2d 319, 324 (1983). Trial judges may restrict the scope of inquiry on cross-examination, *Robinson v. State,* 298 Md. 193, 201, 468 A.2d 328 (1983), as they "retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Smallwood v. State,* 320 Md. 300, 307, 577 A.2d 356, 359 (1990). *See* Maryland Rule 5–611 (2003) (stating that the trial court has discretion as to the scope of cross-examination and the allowance of leading questions). When the prosecutor testifies in the guise of questioning a witness, the defendant's confrontation rights are implicated. Furthermore, unlike testimony by a lay witness, testimony from the prosecutor may be accorded a higher degree of reliability by the jury due to the prestige and assumption of trustworthiness accompanying the position of State's Attorney.

Prosecutors are held to even higher standards of conduct than other attorneys due to their unique role as both

advocate and minister of justice. The special duty of the prosecutor to seek justice is said to exist because the State's Attorney has broad discretion in determining whether to initiate criminal proceedings. *Brack v. Wells,* 184 Md. 86, 90, 40 A.2d 319, 321 (1944). The office of prosecutor is therefore "not purely ministerial, but involves the exercise of learning and discretion," and he or she "must exercise a sound discretion to distinguish between the guilty and the innocent." *Id.* The responsibilities of the prosecutor encompass more than advocacy. The prosecutor's duty is not merely to convict, but to seek justice. "His obligation is to protect not only the public interest but the innocent as well and to safeguard the rights guaranteed to all persons, including those who may be guilty." *Sinclair v. State,* 27 Md.App. 207, 222–23, 340 A.2d 359, 369 (1975). *See also* Maryland Rule of Professional Conduct 3.8 (2003), as adopted by Maryland Rule 16–812:

The prosecutor in a criminal case shall:

(a) refrain from prosecuting a charge that the prosecutor knows is not supported by probable cause;

(b) make reasonable efforts to assure that the accused has been advised of the right to, and the procedure for obtaining, counsel and has been given reasonable opportunity to obtain counsel;

(c) not seek to obtain from an unrepresented accused a waiver of important pretrial rights, such as the right to a preliminary hearing;

(d) make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclosure to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal; and

(e) exercise reasonable care to prevent an employee or other person under the control of the prosecutor in a criminal case from making an extrajudicial statement that

the prosecutor would be prohibited from making under Rule 3.6.

The special duties of the prosecutor take concrete form in the rule against prosecutorial vouching and the advocate-witness rule.

The Ninth Circuit in *Edwards* reversed the defendant's criminal conviction upon concluding that the prosecutor in that case violated both the rule against prosecutorial vouching and the advocate-witness rule. 154 F.3d at 921. Unlike the common law voucher rule, the prosecutorial voucher rule prohibits a prosecutor from expressly vouching for the veracity of a witness's testimony. The bar against prosecutorial vouching makes it improper for a prosecutor to make suggestions, insinuations, and assertions of personal knowledge.

In *Edwards*, the improper behavior was the prosecutor's role in discovering a crucial piece of evidence that linked the defendant to the crime. The prosecutor then called two detectives to testify that they had observed the prosecutor discover the pertinent evidence. As the discoverer of the evidence, the prosecutor was "a silent witness vouching for the authenticity of this piece of evidence before a jury in a case in which he's trying before the jury." 154 F.3d at 918–19. This assertion of personal knowledge, and indeed participation in the discovery of the crucial piece of evidence, improperly brought the prestige and authority of the prosecutor's office to bear at trial. The court in *Edwards* found that the prosecutor improperly conveyed the message to the jury that he believed that the item of evidence was legitimate and honestly discovered, was even more prejudicial than the usual vouching message, and warranted reversal of the conviction. 154 F.3d at 922. The court aptly stated, "[w]hen the credibility of witnesses is crucial, improper vouching is particularly likely to jeopardize the fundamental fairness of the trial." 154 F.3d at 921 (quoting *United States v. Molina,* 934 F.2d 1440, 1445 (9th Cir.1991)). The court in *Edwards* found that violation of the values underlying both the ban against prosecutorial vouching and the limits imposed by the advocate-witness rule worked in tandem to prejudice the defendant in that case.

The advocate-witness rule is a rule of professional conduct that prevents an attorney from taking the witness stand in a case he or she is litigating. Maryland Rule of Professional Conduct 3.7 (2003).[12] The *Edwards* court observed that the advocate-witness rule assumes heightened importance in a criminal case because "jurors will automatically presume the prosecutor to be credible and will not consider critically any evidence that may suggest otherwise." 154 F.3d at 921. Like the prosecutorial voucher rule, the concern is that "jurors will be influenced unduly by the prestige and prominence of the prosecutor's office and will base their credibility determinations on improper factors." *Id.* When the prosecutor makes assertions of personal knowledge in the form of questions during either direct or cross-examination the prejudice to the criminal defendant may be significant because the defendant is denied his confrontation rights and is unable to cross-examine the prosecutor to test the veracity of the assertions.

The Court of Special Appeals observed in *Curry v. State*, 54 Md.App. 250, 258, 458 A.2d 474, 479 (1983), that "[g]enerally, comments by prosecutors on the reputation or credibility of witnesses have been condemned as prejudicial conduct." The comments at issue in *Curry* were made in the course of the State's closing argument and found to be "gross misstatements of fact" sufficient to deny the defendants a fair trial and require reversal of their convictions and a new trial. 54 Md.App. at 258–59, 458 A.2d at 479. The intermediate appellate court found that the prosecutor recklessly misrepresented

---

**12.** Rule 3.7, as adopted by Maryland Rule 16–812, states:
Lawyer as witness.
(a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness except where:
    (1) the testimony relates to an uncontested issue;
    (2) the testimony relates to the nature and value of legal services rendered in the case; or
    (3) disqualification of the lawyer would work substantial hardship on the client.
(b) A lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by Rule 1.7 or Rule 1.9.

the character of two of the State's witnesses in order to bolster the State's "circumstantial case." 54 Md.App. at 252, 458 A.2d at 476. The credibility of the two witnesses was "the keystone which holds the State's case together" without which "it is extremely doubtful that the State would have attained the conviction of [the defendants]." 54 Md.App. at 257, 458 A.2d at 476. Due to the importance of the witnesses' credibility to the State's case, the improper bolstering was found to have misled and influenced the jury to such an extent that reversal was required. *Id.*

We established a framework for weighing assertions of prosecutorial bolstering through improper remarks in *Wilhelm v. State,* 272 Md. 404, 326 A.2d 707 (1974). *Wilhelm* was the result of two consolidated cases—Wilhelm's and Cook's. The contested comments in Wilhelm's trial were made by the prosecutor in his opening statement where he called on the jury to use the trial as an opportunity to "do something about" the crime occurring in its community by convicting the defendant. 272 Md. at 407–08, 326 A.2d at 711. The defense moved for a mistrial after the State's opening argument, but the motion was denied. Defense counsel did not request a cautionary or curative instruction and the trial judge gave none. *Id.*

In the course of the prosecutor's closing argument in Cook's trial, numerous remarks and references were made to statistics about crime in the community that defense counsel argued were prejudicial and which prompted defense counsel to move for a mistrial. 272 Md. at 410–11, 326 A.2d at 713. The trial judge denied the motion, which became an issue on appeal. Noting that "not every ill-considered remark made by counsel, even during the progress of the trial, is cause for challenge or mistrial," we set forth the test for determining whether a remark "exceeds the limits of permissible conduct." 272 Md. at 415, 326 A.2d at 715. We determined that prosecutorial remarks are improper if they have prejudiced unfairly the defendant by misleading or influencing the jury. 272 Md. at 416, 326 A.2d at 716. Unfair prejudice to the defendant is to be measured by evaluating the "closeness of the case," the

"centrality of the issue affected by the error," and the "steps taken to mitigate the effects of the error." *Id.* (Citations omitted).

Applying these principles, we concluded that the trial judge in Wilhelm's trial properly exercised his discretion in denying the requested mistrial and finding the prosecutor's remarks made in the course of his opening statement not to be sufficiently prejudicial. 272 Md. at 437, 326 A.2d at 727. We likewise concluded that the trial judge in Cook's trial was in "the most advantageous position to evaluate from the remarks any potential prejudice to the defendant," and examination of the entire proceedings revealed that the evidence against Cook was "overwhelming" such that the prosecutorial remarks did not prejudice unfairly the defendant. 272 Md. at 445, 326 A.2d at 732.

A somewhat more apposite situation arose in *Elmer v. State,* 353 Md. 1, 724 A.2d 625 (1999). *Elmer* involved assertions made by the prosecutor during cross-examination implying personal knowledge of certain facts embedded in a question. The prosecutor asked Brown, one of the two co-defendants, on cross-examination the following question:

Mr. Brown, did you ever make the statement that when you came down around the curve ... your attention was drawn to the people that were running from your left, and that at that point in time Allen Elmer [the other co-defendant] put that gun out the window, pulled the trigger, the gun boomed, and the first thing you said to him is what the F did you do? Did you ever make that statement?

353 Md. at 5, 724 A.2d at 627. After numerous objections by defense counsel, the prosecutor and defense counsel approached the bench where Brown's counsel explained that the statement referred to by the prosecutor's question was a statement made in the course of plea negotiations and as such would be inadmissible as evidence. 353 Md. at 6, 724 A.2d at 627.

On appeal, Elmer argued that the rules of evidence governing hearsay and his confrontation rights were violated by the

repeated recitation of Brown's alleged statement as presented in question format by the prosecutor. 353 Md. at 9, 724 A.2d at 628–29. Elmer asserted that, although Brown denied making such statements, the jury nonetheless was prejudiced by the prosecutor's repeated references. The State argued that Brown's statements were only offered to impeach Brown and were harmless because Brown denied making the statements.[13] 353 Md. at 10, 724 A.2d at 629. The Court of Special Appeals, when it decided *Elmer,* stated:

> Once Brown's counsel explained at sidebar that his client had never made the statement, however, the prosecutor had no business maintaining this line of inquiry and should have withdrawn the question. By repeating the question in verbatim detail, even down to editing out the "F" word for the benefit of propriety, the prosecutor only exacerbated the potential for the question to mislead the jury into treating the question itself as actual evidence.... When the prosecutor asked his fourth and final question (which went unanswered), he even went so far as to ask, 'Did you ever *communicate to me* that you were going to testify....' This gave the jury the clear impression that the prosecutor's entire line of questions regarding Brown's prior inconsistent statement was based on personal knowledge and derived from Brown himself. Not only did the prosecutor have no ability to prove this, it was actually known by him to be false.

353 Md. at 12–13, 724 A.2d at 630 (quoting *Elmer v. State,* 119 Md.App. 205, 218–19, 704 A.2d 511, 517 (1998)).

We observed in our opinion in *Elmer* that "[i]t is misconduct for a lawyer to inject inadmissible matters before a jury by asking a question that suggests its own otherwise inadmissible answer, 'hoping that the jury will draw the intended meaning

---

13. The State also argued that the statements were admissible under Maryland Rule 5–410 because the Rule applies to the defendant who made the plea or participated in the plea discussions. We found in that regard that because Elmer was not a participant in the plea discussions between Brown and the State, the Rule did not proscribe the State's use of the statements as to Elmer.

from the question itself.' " 353 Md. at 13, 724 A.2d at 630–31 (quoting C. WOLFRAM, MODERN LEGAL ETHICS, § 12.1.2, at 623 (1986)). We further stated that "a prosecutor may not ask a question 'which implies a factual predicate which the examiner knows he cannot support by evidence. . . .' " *Id.* (quoting *United States v. Elizondo,* 920 F.2d 1308, 1313 (7th Cir.1990)). Applying the law to the facts in *Elmer,* we concluded that the prosecutor's questions suggested the existence of facts which he could not prove. 353 Md. at 14, 724 A.2d at 631. Additionally, we found that the prosecutor's questions were improper because they implied his personal opinion that Brown was being untruthful, contravening the principle forbidding prosecutors from expressing personal opinions concerning the truthfulness of witnesses. 353 Md. at 15, 724 A.2d at 631. We held that the trial court should have precluded the prosecutor's inquiry because it was unfairly prejudicial and inadmissible as to both Brown and Elmer. We further held that the attempted impeachment of Brown with his alleged prior inconsistent statement that Elmer was the gunman increased the possibility that Elmer would be convicted on the basis of the unsworn evidence and so could not be considered harmless error. 353 Md. at 16, 724 A.2d at 632.

The U.S. Supreme Court addressed the egregious [14] misbehavior of a federal prosecutor in the course of cross-examination in *Berger v. United States,* 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). In that case the prosecutor made several misstatements of fact during his cross-examination of the defendant and repeatedly mischaracterized the defendant's answers. 295 U.S. at 84, 55 S.Ct. at 631, 79 L.Ed. at 1319. The Court found that the record clearly indicated that the prosecutor "overstepped the bounds of that propriety and fairness which should characterize the conduct of such an

---

**14.** We do not suggest, by inclusion in our analysis of this discussion of *Berger,* that the prosecutor's conduct there equates to what we find in the record of the present case. As far as we have been directed by Petitioner, the sole incident under consideration here was the prosecutor's pertinent questioning of Myrick.

officer in the prosecution of a criminal offense." *Id.* The prosecutor engaged in conduct including the following:

> misstating the facts in his cross-examination of witnesses; of putting into the mouths of such witnesses things which they had not said; of pretending to understand that a witness had said something which he had not said; of suggesting by his questions that statements had been made to him personally out of court, in respect of which no proof was offered; of pretending to understand that a witness had said something which he had not said and persistently cross-examining the witness upon that basis; of assuming prejudicial facts not in evidence; of bullying and arguing with witnesses; and in general, of conducting himself in a thoroughly indecorous and improper manner.

*Id.* Although the trial judge sustained objections to some of the prosecutor's questions and gave limiting instructions to the jury, the Supreme Court deemed that "stern rebuke and repressive measures" were required and, if those measures were unsuccessful, granting a mistrial would be warranted. 295 U.S. at 85, 55 S.Ct. at 632, 79 L.Ed. at 1320. The Court ordered a new trial based on the egregious breach of prosecutorial conduct found at trial. Noting that the prosecutor represents "a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all," the Court described the role of prosecutor as a "servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer." 295 U.S. at 88, 55 S.Ct. at 633, 79 L.Ed. at 1321. The prosecutor is to be mindful of these competing roles and "refrain from improper methods calculated to produce a wrongful conviction." *Id.*

In the two cases bundled in *Wilhelm,* the evidence presented at trial was found to be substantial and the improper prosecutorial remarks did not bear on issues central to the case. The references in opening and closing arguments made by the prosecutors in *Wilhelm* about the degree and nature of the criminal activities occurring in the community referred to alleged matters of common knowledge and were not assertions by the prosecutor that he had personal knowledge about

witness testimony or evidence. Thus, the comments in both cases were not unfairly prejudicial to Cook or Wilhelm.

The prosecutor's conduct in *Elmer* was more prejudicial than the conduct at issue in *Wilhelm* because the prosecutor in *Elmer* conveyed the impression to the jury that he had personal knowledge that the witness, Brown, had made the inadmissible statement. By indicating that he had personal knowledge of Brown's alleged statement, he forced the jury to evaluate the truthfulness of Brown's denial that he made the contested statement in terms of whether the State's Attorney was lying about the matter. The State's Attorney essentially communicated to the jury that it was Brown's word against his. Such a situation unfairly prejudiced the defendant because the State's Attorney could not be cross-examined on his assertions of fact and the facts asserted were not properly in evidence. The prosecutor unfairly misled the jury through the improper form and content of his questions to Brown. Because the questions asked of Brown assumed facts not in evidence, the *Elmer* jury was misled and improperly influenced by the prosecutor. By conveying the impression to the jury that he had superior information of facts not in evidence, the prosecutor's inquiry was highly prejudicial and inadmissible in *Elmer*.

The prosecutor in Walker's trial made prejudicial assertions of personal knowledge of facts not in evidence and engaged in improper cross-examination. Like the prosecutor in *Elmer*, the prosecutor here created a situation where the jury was required to weigh the prosecutor's "word" against the witness's "word." The prosecutor intimated, by her questions, that Myrick was lying on the stand and that in fact he had made inconsistent statements to the prosecutor before trial. The prosecutor also stated multiple times that she knew Myrick's mental state and that he was afraid of telling the truth on the stand. The effect of her repetitious assertions that she knew Myrick was changing his story on the stand out of fear of retaliation encouraged the jury to accept the content of her questions as evidence. That she conveyed her personal

view that Myrick was lying on the stand may have caused the jury to give more weight to her "word" than Myrick's "word." Their stories were inconsistent and therefore only one could be telling the truth.

The fact that the prosecutor in this case made improper assertions of personal knowledge on examination of her own witness, rather than on cross-examination of the defendant's witnesses as in *Elmer,* is not material to our analysis. The jury has greater reason to assume the prosecutor is telling the truth regarding the State's own witnesses because those witnesses supposedly are on the same "team" as the prosecutor. Therefore, the prosecutor, it may have been assumed, would have more reason to know whether her ~~the~~ witness was lying than if the witness was called by the adverse party. By asserting that she knew Myrick was lying, the prosecutor engaged in a form of reverse prosecutorial vouching.

In the end, it was an abuse of discretion for the trial judge to deny Walker's request for a mistrial on this ground. Not unlike *Elmer,* the prejudicial remarks made by the prosecutor in this case tainted the fairness of Walker's trial. Although there was other evidence linking him to the crimes, in the absence of Myrick's testimony, Myrick was nonetheless an eyewitness whose testimony corroborated that of the police officers. The importance to a fact finder of eyewitness testimony is not to be overlooked. As we so recently stated in *Collins v. State,* 373 Md. 130, 816 A.2d 919, 929 (2003) (No. 46, 2002 Term), "[w]hether a witness can identify positively the accused at the scene of the crime is often the cardinal facet of a determination of guilt." In the present case, Myrick was the only eyewitness who was not a law enforcement officer. The prosecutor's "testimony" also could have been viewed by the jury as casting additional negative aspersions on Walker's character by implying that someone, probably Walker or someone at his behest, had threatened Myrick not to implicate him. This prosecutorial vouching, as in *Edwards,* also prejudiced Walker's case. If the view of the *Edwards* court regarding jurors' general attitudes toward prosecutors is correct, as we believe it is, then the prosecutor's use of Myrick to

put her version of certain events before the jury crossed-over the line. Her "testimony" was unassailable by Walker's counsel as she technically was never sworn as a witness.

As we stated in *Klauenberg v. State,* 355 Md. at 555, 735 A.2d at 1075, the decision of a trial court to deny a request for a mistrial will be reversed on appeal only if the trial court abused its discretion and the defendant was clearly prejudiced by the trial court's abuse of discretion. The prosecutor's improper conduct in this case clearly prejudiced the defendant unfairly by undermining Myrick's testimony beneficial to the defendant and by getting before the jury the prosecutor's personal belief that Walker was guilty and her further assertions that someone, likely Walker, threatened Myrick to change his testimony.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AND TO REMAND THE CASE TO THE CIRCUIT COURT FOR A NEW TRIAL; COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY MONT-GOMERY COUNTY, MARYLAND.*